*1052656550*

DOCUMENT SPLIT INTO MULTIPLE PARTS

# IN THE DISTRICT COURT OF CLEVELAND COUN___ PART A
## STATE OF OKLAHOMA

STATE OF OK~~~~~~~ } S.S.
CLEVELAND COUNTY

**FILED**

JUN 29 2022

In the office of the
Court Clerk MARILYN WILLIAMS

Case No. CJ-2022-732

**ATTORNEY LIEN CLAIMED**

**(1) SHAUNTAE OSBORNE-FRANKLIN**, as Personal Representative of the Estate of Terrance Lavon Osborne,

        Plaintiff,

v.

**(1) BOARD OF COUNTY COMMISSIONERS OF CLEVELAND COUNTY;**
**(2) CHRIS AMASON**, in his individual and official capacities;
**(3) BLAKE GREEN**, in his individual capacity;
**(4) JAMES GLASCO**, individually and in his capacity as Captain and jail administrator;
**(5) JOHN AND JANE DOE JAILERS 1-9;**
**(6) BRANDY GARNER;**
**(7) TURN KEY HEALTH CLINICS, LLC**, a domestic limited liability company;
**(8) TARA WILSON**, an individual;
**(9) NICOLE MUSGROVE**, an individual;
**(10) BECKY PATA**, an individual;
**(11) SARAH NUNEZ**, an individual;
**(12) DEREK MCGUIRE**, an individual;
**(13) SARAH CHANCE**, an individual;
**(14) ALANA MORRIS**, an individual;
**(15) BRITTANY JANKIEWICZ**, an individual;
**(16) REBECCA BRUCE**, an individual;
**(17) DAVID SAGIN**, an individual;

EXHIBIT

2

**(18) CHRISTINA MEZA, an individual;**
**(19) BRITTANY LINTON, an individual.**

           **Defendants.**

## PETITION

COMES NOW Plaintiff, Shauntae Osborne-Franklin as Personal Representative of the Estate of Terrance Lavon Osborne, for her cause of action against the above-named defendants, alleges and states:

## THE PARTIES

1. Plaintiff, Shauntae Osborne-Franklin, is and was a citizen of Alabama at the times material hereto.

2. Terrance Lavone Osborne ("Osborne") was a citizen and resident of Cleveland County, Oklahoma, at the time of incident hereinafter described.

3. Defendant Board of County Commissioners of Cleveland County ("County") is and was at all times relevant hereto responsible for the operation of the F. DeWayne Beggs Detention Center, operated in Cleveland County, and was responsible for the training and supervision of Defendants James Glasco ("Glasco"), Darby Hammonds ("Hammonds"), Mary Colvin ("Colvin"), Jake Moore, ("Moore"), Journey Wright, ("Wright"), and Cheyann Brophy ("Brophy"). At all times relevant hereto, County and its officers/employees were acting under color of state law. County was further responsible for the supervision of Defendant Turn Key in its role as County's contractor for provision of medical care at the detention center.

4. County, at the times material hereto, delegated to Defendant Blake Green ("Green") individually and to Defendant Chris Amason ("Sheriff") in his official capacity, the responsibility and authority to establish and implement policies, procedures, practices, and customs used by Cleveland County deputies and jailers regarding the provision of adequate medical care to pre-trial detainees. At all times material hereto, Green and Sheriff were acting under color of state law.

5. Green was at all times relevant hereto Cleveland County Sheriff, employed by and working for County. Green engaged in conduct complained of under color of law and within the scope of his employment as agent and representative of County. County delegated final decision-making authority to Green to stablish policy with regard to the operation of the F. DeWayne Beggs Detention Center, including the detention and medical care for pre-trial detainees. The policies, practices, and customs, promulgated, created, and implemented and/or utilized by Green represent the official policies and/or customs of County with regard to the operation of the F. DeWayne Beggs Detention Center. Allegations against Green are made both in his individual capacity, and in his official capacity through the current Sheriff, Chris Amason.

6. Glasco was at all times relevant hereto the Captain of the Cleveland County Sheriff's Department responsible for the operation of the F. DeWayne Beggs Detention Center. Glasco is sued in both his individual capacity and in his official capacity for acts performed while he was the Caption overseeing the F. DeWayne Beggs

Detention Center. At all times relevant herein, Glasco was acting under the color of law and within the course and scope of his employment with Cleveland County.

7. Defendant Turn Key Health Clinics, LLC ("Turn Key") is and was at all relevant times a private Oklahoma limited liability company that is independently contracted by County, Green, and Sheriff to provide medical services at the F. DeWayne Beggs Detention Center and at all times relevant hereto, was responsible for the training and supervision of its employees, Defendants Tara Wilson ("Wilson"), Nicole Musgrove ("Musgrove"), Becky Pata ("Pata"), Sarah Nunez ("Nunez"), Derek McGuire ("McGuire"), Sarah Chance ("Chance"), Alana Morris ("Morris"), Brittany Jankiewicz ("Jankiewicz"), Rebecca Bruce ("Bruce") and David Sagin ("Sagin").

8. Defendant County, Green, Sheriff, and/or Glasco, at all times relevant hereto, delegated to Turn Key the responsibility to establish and implement policies, procedures, practices, and customs used at the F. DeWayne Beggs Detention Center in regard to the provision of medical care to pre-trial detainees. At all times relevant hereto, Turn Key and its agents/employees were acting under color of state law.

9. Wilson was, at all relevant times, a Licensed Practical Nurse employed by and working for Turn Key. Wilson engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

10. Musgrove was, at all relevant times, employed by and working for Turn Key. Musgrove engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

11. Pata was, at all relevant times, a Nurse Practitioner, employed by and working for Turn Key. Pata engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

12. Nunez was, at all relevant times, employed by and working for Turn Key. Nunez engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

13. McGuire was, at all relevant times, a Licensed Practical Nurse employed by and working for Turn Key. McGuire engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

14. Chance was, at all relevant times, employed by and working for Turn Key. Chance engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

15. Morris was, at all relevant times, a Licensed Practical Nurse employed by and working for Turn Key. Morris engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

16. Jankiewicz was, at all relevant times, a Licensed Practical Nurse employed by and working for Turn Key. Jankiewicz engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

17. Bruce was, at all relevant times, a Nurse Practitioner employed by and working for Turn Key. Bruce engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

18. Sagin was, at all relevant times, a Licensed Practical Nurse employed by and working for Turn Key. Sagin engaged in the conduct complained of under color of law and in the scope of employment as an agent and representative of Turn Key.

## JURISDICTION AND VENUE

19. Plaintiff incorporates all previous allegations as if restated herein.

20. This action arises from the events that occurred during the detention of Osborne at the F. DeWayne Beggs Detention Center, including but not limited to the failure to provide adequate medical care, which resulted in Osborne's death.

21. At all material times mentioned herein, the individual jailers and jail medical staff involved in this incident were acting under color of state law and within the scope of their employment and/or authority as employees, agents, and/or servants for County, Green, Sheriff, Glasco, and/or Turn Key.

22. Plaintiff has complied with all requirements under the Oklahoma Governmental Tort Claims Act, 51 O.S. § 151, *et seq.*

23. In the alternative, Turn Key was acting outside the scope of its employment, such that the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153(C) does not exempt Turn Key from liability for its tortious conduct.

24. In the alternative, Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, were acting outside the scope of their employment, such that the Oklahoma Governmental Tort Claims Act, 51 O.S. § 153(C) does not exempt them from personal liability for their tortious conduct.

25. This court has jurisdiction over the parties hereto, jurisdiction over the subject-matter hereof, and venue is proper.

## FACTUAL BACKGROUND

Plaintiff incorporates all previous factual allegations and statements and further alleges as follows:

### *Osborne's Ongoing Medical Conditions*

26. Prior to his detention at the F. DeWayne Beggs Detention Center beginning on October 21, 2020, Terrance Osborne suffered from chronic health conditions including congestive heart failure and bilateral peripheral edema. He also required a wheelchair.

27. To manage these health conditions, Mr. Osborne required specific medical treatments and administration of specific medications. Those required medications at the time of his detention included: methocarbamol, furosemide, lisinopril, potassium, omeprazole, and metoprolol.

28. On the morning of October 21, 2020, Terrance Osborne was seen at Norman Regional Hospital for complaints of shortness of breath, as well as for his congestive heart failure and bilateral peripheral edema.

### *Osborne's Arrest and Arrival at the F. DeWayne Beggs Detention Center*

29. At approximately 1:09 p.m. on October 21, 2020, Terrance was arrested by the Norman Police Department and booked in to the F. DeWayne Beggs Detention Center.

30. All defendants were put on notice of Terrance's above-described medical conditions on October 21, 2020, during the medical intake screening performed upon book-in at the F. DeWayne Beggs Detention Center. Subsequently, Defendant Turn Key obtained Terrance Osborne's discharge paperwork from Norman Regional Hospital for the October 21, 2020, visit.

### Osborne is Detained – Oct. 21-Nov. 14, 2020

31. Turn Key never obtained – or even attempted to obtain – any of Terrance's medical records pertaining to his condition from his current doctors, despite being given the names of those doctors.

32. Turn Key did not administer any of Terrance's vitally necessary prescription medications to him for at least the first three days he was present in the Cleveland County Jail, with verification of Terrance's medications from Walgreen's not being obtained until October 28, 2020.

33. On October 26, 2020, Terrance was evaluated by Pata who merely recited his condition and ordered that he be seen again in ninety days despite the chronic and life-threatening nature of his condition.

34. That same day, Terrance was taken back to Norman Regional Hospital, while still in custody. Terrance was seen for his congestive heart failure and bilateral peripheral edema, as well as for anasarca and fluid overload.

35. The physician who saw Terrance ordered that he follow up with a physician in 1-3 days.

36. No higher level medical provider – specifically Defendants Cooper, Pata, or Bruce – saw Terrance within that ordered timeframe for monitoring his condition.

37. During the period from October 26, 2020 November 4, 2020, Terrance continued to complain of chest pains, shortness of breath, swelling/edema, and an inability to move, and was deprived of his medication on multiple occasions due to his inability to get up arising from his fatigue, edema, and other symptoms related to his congestive heart failure.

38. Terrance repeatedly requested to be taken back to the hospital to receive the appropriate treatment and medications that he was being denied while at the Cleveland County Jail.

39. On November 4, 2020, Defendant Bruce finally came to perform the follow up evaluation of Terrance. However, due to Terrance's demands to be taken back to the hospital, Bruce and Defendant Sagin decided not to evaluate Terrance in person and instead claimed he refused to be seen.

40. Nonetheless, Pata ordered that Terrance's weight be continuously monitored because significant weight gain is a worrying symptom and indicator of worsening fluid retention and worsening of Terrance's congestive heart failure.

41. From that point forward, no medical staff checked Terrance's weight despite it being part of the standard of care of congestive heart failure patients and explicitly ordered in Terrance's medical records.

42. Terrance gained considerable weight during his detention, going from 207 pounds on October 26, 2020, to 233 pounds on November 14, 2020.

43. Terrance's condition significantly declined through November 13, 2020, when he was found unresponsive in his cell.

44. Terrance's decline was obvious and evidenced by:

    a. Increased swelling, edema, anasarca, and ascites, including in his legs and so bad in his face that he could not see at times;

    b. Increased weeping of fluid from his legs;

    c. Skin sloughing off of his feet;

    d. Foul odors coming from his feet;

    e. Infection in his legs and feet;

    f. Urinary incontinence;

    g. The development of pressure ulcers on his perineum;

    h. Continued complaints of chest pain and shortness of breath; and

    i. Increasing complaints of an inability to move.

45. Despite these obvious signs of Terrance's serious medical risk and decline, he was never taken for outside emergency care or specialty care until he was found unresponsive in his cell on November 13, 2020.

46. Terrance was taken to the hospital after being found unresponsive late on November 13, 2020.

47. On the way to the hospital Terrance was revived, but had no consciousness and required life support to remain alive.

48. Plaintiff was then forced to make the decision to take Terrance off of life support due to his poor medical outlook and dependency on life support to even remain alive.

49. At the hospital, Plaintiff was informed by Terrance's doctors that it appeared to them Terrance had none of his prescribed medications for his congestive heart failure in his system when he was at the hospital.

## FIRST CAUSE OF ACTION:
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

**Defendant Cooper**

50. Defendant Cooper was at all times relevant hereto, the responsible physician and the Responsible Health Authority at the Cleveland County Jail who was responsible for the provision of care to Terrance and responsible for overseeing lower-level providers – Defendants Pata and Bruce – and nursing staff – Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin – in the provision of care to Terrance.

51. Defendant Cooper is alleged to have acted with deliberate indifference in his personal participation in the provision – or failure to provide – care to Terrance and in his role as supervisor of the other medical staff involved in the treatment of Terrance.

### Objective Component – Sufficiently Serious Condition/Harm

52. Terrance suffered from a sufficiently serious condition which presented risk of death and/or pain and suffering, through his diagnoses of congestive heart failure and hypertension, and suffered sufficiently serious harms including death, significant loss of chance of survival and/or life expectancy, and unnecessary and increased pain and suffering through the substantial pain and suffering Terrance endured as a result of his worsening condition, including chest pains, shortness of breath, painful

swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move.

### Subjective Component – Deliberate Indifference

53. Defendant Cooper was aware of the serious medical conditions Terrance was diagnosed with – congestive heart failure and hypertension – through the disclosure of that information in Terrance's medical intake and the hospital discharge paperwork that accompanied Terrance at the time he was booked in to the Cleveland County Jail, and Turn Key medical providers' prescription of medications for Terrance's congestive heart failure.

54. Despite his awareness of this serious medical condition, Defendant Cooper did nothing to provide or oversee the provision of care to Terrance.

55. During Terrance's detention at the Cleveland County Jail, Defendant Cooper never once examined or visited Terrance to assess his condition and the ongoing course of treatment – or lack thereof – to Terrance for his serious, known, medical conditions.

56. During Terrance's detention at the Cleveland County Jail, Defendant Cooper reviewed the medical records generated by Turn Key staff as a part of his role as the supervising or responsible physician overseeing the provision of care to Terrance.

57. Cooper knew that:

    a. Terrance increasingly requested and begged to go to the hospital,

    b. Terrance's edema, anasarca, and ascites was severely worsening throughout his detention,

c. Terrance's mobility was rapidly deteriorating with increasing complaints that Terrance could not move and having urinary incontinence issues,

d. Terrance was suffering from infection in his legs with foul odors and skin sloughing off,

e. Terrance was developing pressure ulcers on his perineum,

f. Turn Key's subordinate medical staff completely failed to monitor Terrance's weight as the standard of care requires for patients with congestive heart failure, and as ordered by Defendant Bruce on November 4, 2020,

g. Cooper, as the medical director for Turn Key, does nothing to assess the skills and competencies of lower-level nursing staff, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were expected to – and did – provide the majority of care to Terrance,

h. LPNs, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were relied on to provide the majority of care to Terrance and who were expected to be the gatekeeping medical officials controlling Terrance's access to higher level providers or outside medical care had little to no training or guidance on when or what conditions and symptoms warrant contacting a higher-level provider, including Defendants Cooper, Pata, and Bruce, or sending Terrance for outside hospital or specialist care,

i. Cooper, as the medical director for Turn Key, does not provide any resource or actual training to LPNs, including Defendants Wilson, Musgrove, Nunez,

McGuire, Chance, Morris, Jankiewicz, and Sagin, regarding when a condition warrants contacting a higher-level provider or outside medical care for detainees.

58. Despite having the knowledge set forth above, Cooper never evaluated Terrance, never took any steps to order further evaluation or increased care for Terrance despite his obviously, serious worsening condition and risk of death, never gave any orders to any lower-level provider to rectify the obvious deficiencies in the care provided to Terrance prior to his death, and never referred Terrance for outside specialty or hospital care despite his worsening condition in the period from October 27, 2020, through Terrance's death on November 14, 2020.

59. Cooper also chose not to take any steps to supervise the care provided to Terrance to ensure that it complied with the standard of care for patients with congestive heart failure, that orders were being followed by lower-level staff, and that necessary emergency or specialty care was obtained as needed.

60. Cooper's decision not to act in any way despite having the knowledge set forth above, was the result of his deliberate indifference to the well-being of Terrance Osborne and all detainees at the Cleveland County Jail.

61. In the alternative, Cooper made the decision not to review any medical records pertaining to Terrance Osborne, despite his role as supervising/responsible physician and the legal requirements that he supervise the care provided to Terrance.

62. Cooper's decision not to review any medical records or take any action to oversee the actions of lower-level medical providers in the provision of care to Terrance, was the result of Cooper's deliberate indifference to the well-being and health of Terrance.

### Causation

63. As a result of Cooper's deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

64. As a result of Cooper's deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

65. As a result of Cooper's deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

### Defendant Pata

66. Defendant Pata was, at all times relevant hereto, a CRNP with Turn Key who participated in providing care to Terrance and participated in the oversight of lower-level nursing staff, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who assisted in the provision of care to Terrance.

### Objective Component – Sufficiently Serious Condition/Harm

67. Terrance suffered from a sufficiently serious condition which presented risk of death and/or pain and suffering, through his diagnoses of congestive heart failure and hypertension, and suffered sufficiently serious harms including death, significant loss of chance of survival and/or life expectancy, and unnecessary and increased pain and suffering through the substantial pain and suffering Terrance endured as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move.

### Subjective Component – Deliberate Indifference

68. Defendant Pata was aware of the serious medical conditions Terrance was diagnosed with – congestive heart failure and hypertension – through the disclosure of that information in Terrance's medical intake and the hospital discharge paperwork that accompanied Terrance at the time he was booked in to the Cleveland County Jail.

69. Despite her awareness of the seriousness of Terrance's chronic medical conditions, Defendant Pata only saw Terrance on October 26, 2020.

70. Furthermore, other obvious signs of fluid retention and the worsening of Terrance's congestive heart failure presented, including increasing edema in Terrance's legs, edema in Terrance's face that was so bad he could hardly see through swollen eyes, infection in his legs accompanied by foul odors and skin sloughing off.

71. During Terrance's detention at the Cleveland County Jail, Defendant Pata reviewed the medical records generated by Turn Key staff as a part of her role in the provision of care to Terrance and the supervision of nursing staff providing care to Terrance.

72. Pata knew that:

    a. Terrance increasingly requested and begged to go to the hospital,

    b. Terrance's edema, anasarca, and ascites was severely worsening throughout his detention,

    c. Terrance's mobility was rapidly deteriorating with increasing complaints that Terrance could not move and having urinary incontinence issues,

    d. Terrance was suffering from infection in his legs with foul odors and skin sloughing off,

    e. Terrance was developing pressure ulcers on his perineum,

    f. Turn Key's subordinate medical staff completely failed to monitor Terrance's weight as the standard of care requires for patients with congestive heart failure and as ordered by Defendant Bruce on November 4, 2020,

    g. Turn Key does nothing to assess the skills and competencies of lower-level nursing staff, including LPNs and other medication and nursing aides including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were expected to – and did – provide the majority of care to Terrance,

    h. LPNs, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were relied on to provide the majority of care to Terrance and who were expected to be the gatekeeping medical officials controlling Terrance's access to higher level providers or outside medical care had little to no training or guidance on when or what conditions

and symptoms warrant contacting a higher-level provider, including Defendants Cooper, Pata, and Bruce, or sending Terrance for outside hospital or specialist care,

    i. Cooper, as the medical director for Turn Key, does not provide any resource or actual training to LPNs, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, regarding when a condition warrants contacting a higher-level provider or outside medical care for detainees.

73. Despite having the knowledge set forth above, Pata evaluated Terrance one time and then never took any steps to order further evaluation or increased care for Terrance despite his obviously, serious worsening condition and risk of death, never gave any orders to any lower-level provider to rectify the obvious deficiencies in the care provided to Terrance prior to his death, and never referred Terrance for outside specialty or hospital care despite his worsening condition in the period from October 27, 2020, through Terrance's death on November 14, 2020.

74. Pata took no actions to review Terrance's medical records or otherwise supervise the lower level providers responsible for Terrance's care.

75. Pata's decision not to act in any way despite having the knowledge set forth above, was the result of her deliberate indifference to the well-being of Terrance Osborne and all detainees at the Cleveland County Jail.

76. In the alternative to the above, Pataa made the decision not to review any medical records pertaining to Terrance Osborne past October 26, 2020, despite her role in supervising the care provided to Terrance.

77. Pata's decision not to review any medical records past October 26, 2020 or take any action to oversee the actions of lower-level medical providers, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, in the provision of care to Terrance, was the result of Pata's deliberate indifference to the well-being and health of Terrance.

## Causation

78. As a result of Pata's deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

79. As a result of Pata's deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

80. As a result of Pata's deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## Defendant Bruce

81. Defendant Bruce was, at all times relevant hereto, an NP with Turn Key who participated in providing care to Terrance and participated in the oversight of lower-

level nursing staff, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who assisted in the provision of care to Terrance.

**Objective Component – Sufficiently Serious Condition/Harm**

82. Terrance suffered from a sufficiently serious condition which presented risk of death and/or pain and suffering, through his diagnoses of congestive heart failure and hypertension, and suffered sufficiently serious harms including death, significant loss of chance of survival and/or life expectancy, and unnecessary and increased pain and suffering through the substantial pain and suffering Terrance endured as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move.

**Subjective Component – Deliberate Indifference**

83. Defendant Bruce was aware of the serious medical conditions Terrance was diagnosed with – congestive heart failure and hypertension – through the disclosure of that information in Terrance's medical intake and the hospital discharge paperwork that accompanied Terrance at the time he was booked in to the Cleveland County Jail, and mention of this condition and diagnosis in Turn Key medical records prior to November 4, 2020, the only date when Defendant Bruce saw Terrance.

84. Despite her awareness of the seriousness of Terrance's chronic medical conditions, Defendant Bruce only "saw" Terrance once on November 4, 2020, without evaluating him in person.

85. Bruce ordered that Terrance's weight be checked daily for indications of his condition worsening.

86. No one took Terrance's weight pursuant to Bruce's order all the way through Terrance's death on November 14, 2020.

87. Furthermore, other obvious signs of fluid retention and the worsening of Terrance's congestive heart failure presented, including increasing edema in Terrance's legs, edema in Terrance's face that was so bad he could hardly see through swollen eyes, infection in his legs accompanied by foul odors and skin sloughing off.

88. During Terrance's detention at the Cleveland County Jail, Defendant Bruce reviewed the medical records generated by Turn Key staff as a part of her role in the provision of care to Terrance and the supervision of nursing staff providing care to Terrance.

89. Bruce knew that:

    a. Terrance increasingly requested and begged to go to the hospital,

    b. Terrance's edema, anasarca, and ascites was severely worsening throughout his detention,

    c. Terrance's mobility was rapidly deteriorating with increasing complaints that Terrance could not move and he was having urinary incontinence issues,

    d. Terrance was suffering from infection in his legs with foul odors and skin sloughing off,

    e. Terrance was developing pressure ulcers on his perineum,

f.  Turn Key's subordinate medical staff completely failed to monitor Terrance's weight as the standard of care requires for patients with congestive heart failure and as ordered by Defendant Bruce on November 4, 2020,

g.  Turn Key does nothing to assess the skills and competencies of lower-level nursing staff, including LPNs and other medication and nursing aides including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were expected to – and did – provide the majority of care to Terrance,

h.  LPNs, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, who were relied on to provide the majority of care to Terrance and who were expected to be the gatekeeping medical officials controlling Terrance's access to higher level providers or outside medical care had little to no training or guidance on when or what conditions and symptoms warrant contacting a higher-level provider, including Defendants Cooper, Pata, and Bruce, or sending Terrance for outside hospital or specialist care,

i.  Turn Key does not provide any resource or actual training to LPNs, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, regarding when a condition warrants contacting a higher-level provider, including Defendants Cooper, Pata, and Bruce, or outside medical care for detainees.

90. Despite having the knowledge set forth above, Bruce evaluated Terrance one time and then never took any steps to order further evaluation or increased care for Terrance despite his obviously, serious worsening condition and risk of death, never gave any orders to any lower-level provider to rectify the obvious deficiencies in the care provided to Terrance prior to his death, and never referred Terrance for outside specialty or hospital care despite his worsening condition in the period from October 27, 2020, through Terrance's death on November 14, 2020.

91. Bruce took no actions to review Terrance's medical records or otherwise supervise the lower level providers responsible for Terrance's care.

92. Bruce's decision not to act in any way despite having the knowledge set forth above was the result of her deliberate indifference to the well-being of Terrance Osborne and all detainees at the Cleveland County Jail.

93. In the alternative to the above, Bruce made the decision not to review any medical records pertaining to Terrance Osborne past November 4, 2020, despite her role in supervising the care provided to Terrance.

94. Bruce's decision not to review any medical records past November 4, 2020, or take any action to oversee the actions of lower-level medical providers, including Defendants Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin, in the provision of care to Terrance, was the result of Bruce's deliberate indifference to the well-being and health of Terrance.

**Causation**

95. As a result of Bruce's deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

96. As a result of Bruce's deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

97. As a result of Bruce's deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant McGuire**

98. Defendant McGuire was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

99. Defendant McGuire was directly involved in the care of Terrance during his detention.

100. Defendant McGuire observed Terrance on multiple occasions and was aware of:

   a. Terrance's diagnosed congestive heart failure;

   b. Terrance's limited mobility and need for a wheelchair;

   c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

   d. Terrance's severe and worsening edema, anasarca, and ascites;

   e. Terrance's face swelling to the point he could not see;

    f.  Terrance's skin sloughing off of his feet;

    g.  Terrance's legs and feet weeping fluids;

    h.  Terrance's feet were emitting foul odors;

    i.  Terrance's legs and feet had clear signs of infection;

    j.  The necessity of a congestive heart failure patient's medications to be provided as prescribed;

    k.  The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

    l.  The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

101. Despite his awareness of this information, McGuire failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, McGuire falsely noted that Terrance was refusing his medications.

102. Despite his awareness of the information set out above, McGuire never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

103. Despite his awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, McGuire never check Terrance's weight from the time of that order through his death on November 14, 2020.

104. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

105. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

106. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

107. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Sagin**

108. Defendant Sagin was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

109. Defendant Sagin was directly involved in the care of Terrance during his detention.

110. Defendant Sagin observed Terrance on multiple occasions and was aware of:

   a. Terrance's diagnosed congestive heart failure;

   b. Terrance's limited mobility and need for a wheelchair;

c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

d. Terrance's severe and worsening edema, anasarca, and ascites;

e. Terrance's face swelling to the point he could not see;

f. Terrance's skin sloughing off of his feet;

g. Terrance's legs and feet weeping fluids;

h. Terrance's feet were emitting foul odors;

i. Terrance's legs and feet had clear signs of infection;

j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

111. Despite his awareness of this information, Sagin failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, Sagin falsely noted that Terrance was refusing his medications.

112. Despite his awareness of the information set out above, Sagin never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

113. Despite his awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Sagin never check Terrance's weight from the time of that order through his death on November 14, 2020.

114. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

115. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

116. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

117. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Nunez**

118. Defendant Nunez was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

119. Defendant Nunez was directly involved in the care of Terrance during his detention.

120. Defendant Nunez observed Terrance on multiple occasions and was aware of:

    a. Terrance's diagnosed congestive heart failure;

    b. Terrance's limited mobility and need for a wheelchair;

    c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

    d. Terrance's severe and worsening edema, anasarca, and ascites;

    e. Terrance's face swelling to the point he could not see;

    f. Terrance's skin sloughing off of his feet;

    g. Terrance's legs and feet weeping fluids;

    h. Terrance's feet were emitting foul odors;

    i. Terrance's legs and feet had clear signs of infection;

    j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

    k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

    l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

121. Despite her awareness of this information, Nunez failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get

out of bed. Rather than take the extra steps to administer Terrance's medications, Nunez falsely noted that Terrance was refusing his medications.

122. Despite her awareness of the information set out above, Nunez never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

123. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Nunez never checked Terrance's weight from the time of that order through his death on November 14, 2020.

124. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

125. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

126. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

127. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Wilson**

128. Defendant Wilson was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

129. Defendant Wilson was directly involved in the care of Terrance during his detention.

130. Defendant Wilson observed Terrance on multiple occasions and was aware of:

   a. Terrance's diagnosed congestive heart failure;

   b. Terrance's limited mobility and need for a wheelchair;

   c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

   d. Terrance's severe and worsening edema, anasarca, and ascites;

   e. Terrance's face swelling to the point he could not see;

   f. Terrance's skin sloughing off of his feet;

   g. Terrance's legs and feet weeping fluids;

   h. Terrance's feet were emitting foul odors;

   i. Terrance's legs and feet had clear signs of infection;

   j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

131. Despite her awareness of this information, Wilson failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, Wilson falsely noted that Terrance was refusing his medications.

132. Despite her awareness of the information set out above, Wilson never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

133. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Wilson never checked Terrance's weight from the time of that order through his death on November 14, 2020.

134. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

135. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

136. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

137. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Musgrove**

138. Defendant Musgrove was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

139. Defendant Musgrove was directly involved in the care of Terrance during his detention.

140. Defendant Musgrove observed Terrance on multiple occasions and was aware of:

    a. Terrance's diagnosed congestive heart failure;

    b. Terrance's limited mobility and need for a wheelchair;

    c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

    d. Terrance's severe and worsening edema, anasarca, and ascites;

    e. Terrance's face swelling to the point he could not see;

    f. Terrance's skin sloughing off of his feet;

    g. Terrance's legs and feet weeping fluids;

h. Terrance's feet were emitting foul odors;

i. Terrance's legs and feet had clear signs of infection;

j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

141. Despite her awareness of this information, Musgrove failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, Musgrove falsely noted that Terrance was refusing his medications.

142. On one instance, on November 12, 2020, Musgrove specifically noted the reason that Terrance's medications were not provided because Terrance could not get up.

143. Despite her awareness of the information set out above, Musgrove never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

144. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Musgrove never checked Terrance's weight from the time of that order through his death on November 14, 2020.

145. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

146. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

147. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

148. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Chance**

149. Defendant Chance was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

150. Defendant Chance was directly involved in the care of Terrance during his detention.

151. Defendant Chance observed Terrance on multiple occasions and was aware of:

  a. Terrance's diagnosed congestive heart failure;

b. Terrance's limited mobility and need for a wheelchair;

c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

d. Terrance's severe and worsening edema, anasarca, and ascites;

e. Terrance's face swelling to the point he could not see;

f. Terrance's skin sloughing off of his feet;

g. Terrance's legs and feet weeping fluids;

h. Terrance's feet were emitting foul odors;

i. Terrance's legs and feet had clear signs of infection;

j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

152. Despite her awareness of this information, McGuire failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, Chance falsely noted that Terrance was refusing his medications.

153. Despite her awareness of the information set out above, Chance never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

154. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Chance never checked Terrance's weight from the time of that order through his death on November 14, 2020.

155. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

156. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

157. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

158. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Jankiewicz**

159. Defendant Jankiewicz was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

160. Defendant Jankiewicz was directly involved in the care of Terrance during his detention.

161. Defendant Jankiewicz observed Terrance on multiple occasions and was aware of:

    a. Terrance's diagnosed congestive heart failure;

    b. Terrance's limited mobility and need for a wheelchair;

    c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

    d. Terrance's severe and worsening edema, anasarca, and ascites;

    e. Terrance's face swelling to the point he could not see;

    f. Terrance's skin sloughing off of his feet;

    g. Terrance's legs and feet weeping fluids;

    h. Terrance's feet were emitting foul odors;

    i. Terrance's legs and feet had clear signs of infection;

    j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

    k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

    l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

162. Despite her awareness of this information, Jankiewicz failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not

get out of bed. Rather than take the extra steps to administer Terrance's medications, Jankiewicz falsely noted that Terrance was refusing his medications.

163. Despite her awareness of the information set out above, Jankiewicz never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

164. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Jankiewicz never checked Terrance's weight from the time of that order through his death on November 14, 2020.

165. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

166. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

167. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

168. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

169. **Defendant Morris**

170. Defendant Morris was employed by Turn Key at the Cleveland County Jail during Terrance's detention.

171. Defendant Morris was directly involved in the care of Terrance during his detention.

172. Defendant Morris observed Terrance on multiple occasions and was aware of:

   a. Terrance's diagnosed congestive heart failure;

   b. Terrance's limited mobility and need for a wheelchair;

   c. Terrance's repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times;

   d. Terrance's severe and worsening edema, anasarca, and ascites;

   e. Terrance's face swelling to the point he could not see;

   f. Terrance's skin sloughing off of his feet;

   g. Terrance's legs and feet weeping fluids;

   h. Terrance's feet were emitting foul odors;

   i. Terrance's legs and feet had clear signs of infection;

   j. The necessity of a congestive heart failure patient's medications to be provided as prescribed;

k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition;

l. The order put in by Defendant Bruce on November 4, 2020, that Terrance's weight be monitored daily.

173. Despite her awareness of this information, Morris failed to administer Terrance his medications on multiple occasions due to Terrance's complaints that he could not get out of bed. Rather than take the extra steps to administer Terrance's medications, Morris falsely noted that Terrance was refusing his medications.

174. Despite her awareness of the information set out above, Morris never referred Terrance for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated.

175. Despite her awareness of the serious medical conditions and Terrance's deteriorating condition, as well as his awareness of the order to monitor Terrance's weight for worsening of his condition, Morris never checked Terrance's weight from the time of that order through his death on November 14, 2020.

176. These actions – and failures to act – with knowledge of Terrance's deteriorating serious medical condition and information set out above constitute deliberate indifference to the obvious risks to Terrance's health and safety.

177. As a result of these deliberately indifferent actions and failures to act, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

178. As a result of these deliberately indifferent actions and failures to act, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

179. As a result of these deliberately indifferent actions and failures to act, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## SECOND CAUSE OF ACTION:
## DELIBERATELY INDIFFERENT POLICIES, PRACTICES, AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT TURN KEY

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

180. Defendants County, Green, Amason, and/or Glasco delegated final authority to establish policies at the F. DeWayne Beggs Detention Center regarding detainee healthcare to Defendant Turn Key.

181. Defendant Turn Key, acting on behalf of Defendants County, Green, Amason, and/or Glasco, as decisionmaker with final authority to establish municipal policy regarding detainee healthcare, deprived Terrance of rights and freedoms secured by the Fourteenth and Eighth Amendments of the U.S. Constitution – specifically freedom from deprivation of adequate medical care constituting cruel and unusual punishment.

182. The policies, practices, and customs, which were promulgated, created, implemented, and/or utilized by Defendant Turn Key represent the official policies

and/or customs of Defendants County, Amason, and/or Glasco with regard to detainee health and safety.

183.     Turn Key and its executives have a business model that generates revenue through governmental contracts. Through these contracts, Turn Key assumes responsibility for the government's obligation to provide healthcare services to people who are not free to seek out healthcare for themselves.

184.     To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

185.     There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of healthcare services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.]

186.     Under the contract, Turn Key is responsible for paying for all pharmaceuticals and outside medical care costs up to a specific limit of financial liability, after which those costs are passed on to County. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications to keep inmates, even inmates with serious, chronic medical needs, at the Jail to avoid off-site medical costs.

187.    These financial incentives create risks to the health and safety of inmates like Osborne, who have complex, chronic, serious medical needs such as congestive heart failure and serious infections.

188.    Defendant Turn Key was directly involved in the violation of Osborne's constitutional rights in the following manners:

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

189.    Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex, chronic, and/or serious medical needs.

190.    During all times relevant hereto, there were no guidelines, or wholly inadequate guidelines, in place as to the standard of care and/or nursing protocols specific to detainees' physical health, inclusive of chronic conditions such as congestive heart failure. It is common knowledge that chronic medical conditions are prevalent in the detainee/inmate population and it is vital that jail medical providers have policies and protocols in place establishing a constitutionally permissible standard of care for jail medical personnel in order to properly provide for those detainees' medical needs.

191.    Further, Turn Key's constitutionally-deficient policies, practices, and/or customs include:

a. Turn Key has an established practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions;

b. Turn Key does not review the policies and procedures of jails it operates in to ensure their own policies and procedures align with those facilities, as admitted by Turn Key Medical Director and the responsible/supervising physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021, specifically including the Cleveland County jail where the jail expects Turn Key's employees to perform periodic sight checks of inmates with heightened medical needs;

c. Turn Key asks each jail it operates in to review Turn Key's policies to ensure their own policies and procedures align with those of the facility, including at the Cleveland County jail, but does nothing to follow up on that comparison or verify that it was done, as admitted by Turn Key Medical Director and the responsible/supervising physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

d. The failure to promulgate, implement, or enforce adequate policies and nursing protocols responsive to the serious medical needs of detainees like

Terrance, inclusive of treating and managing congestive heart failure and medical conditions which can accompany congestive heart failure such as edema, anasarca, ascites, "weeping" fluid from swollen legs, infections, skin sloughing off, mobility limitations, and pressure ulcers;

e. Not obtaining prior medical records relevant to a detainee's serious, chronic medical conditions, such as congestive heart failure;

f. Not seeing detainees for follow-up by the proper level of medical provider in a timely manner as set out by the orders of treating physicians outside of the jail;

g. Detention of seriously, chronically ill detainees in the Cleveland County Jail without access to the diagnostic equipment and laboratory services obviously needed to manage those conditions;

h. Only having *one* physician on staff for the entirety of all jails and all persons under Turn Key's care throughout Oklahoma, leaving it practically impossible for that single physician to supervise and evaluate the care of detainees and the actions of lower-level providers, nurses, and jail medical staff;

i. Improperly and illegally delegating medical care tasks to jail medical staff beyond the legally-defined scope of their credentials and beyond their training and skill;

j. Having LPNs as the highest-trained medical provider at the jail the majority of the time, with other providers only on-call, even though Turn Key is aware that LPNs cannot assess or diagnose a medical condition, including serious,

chronic conditions like congestive heart failure, and Turn Key admittedly does nothing to train those LPNs to assess a medical condition, as admitted by Turn Key Medical Director and the responsible/supervising physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;;

k. Failing to have any physician review – at all or, alternatively, in a timely manner – the medication administration, including pill counts, and patient encounter records of lower-level medical providers who are required to be under the direct supervision of a physician to ensure medications are given as prescribed and documents truthfully and accurately;

l. Severe limitation of or failure to utilize off-site medical and diagnostic service providers, even in emergent situations;

m. Failing to provide Turn Key's orientation program to the jail's administrator as required by Turn Key's policies and procedures, with the failure going as far back as 2018, as admitted by Turn Key Medical Director and the responsible/supervising physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021;

n. Not promptly obtaining prescription medications for detainees with chronic, serious, life-threatening medical conditions; and/or

o. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees, as admitted by Turn Key Medical Director and the Responsible Physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

192. These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex serious medical needs.

193. Turn Key knew or should have known that jailers and medical personnel, including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, frequently encounter and detain individuals with serious, chronic medical conditions such as congestive heart failure.

194. Turn Key knew or should have known that jailers and medical personnel, including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz,

Bruce, and Sagin, frequently encounter and detain individuals at heightened risk of injury or death.

195.  Turn Key knew and understood that discrepancies between Turn Key's policies and procedures and a jail's policies and procedures could lead to confusion and mistakes in the provision of care to detainees, as admitted by Turn Key Medical Director and the Responsible Physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

196.  Turn Key knew that the failures to ensure the similarity and alignment of Cleveland County's jail policies and procedures with Turn Key's policies and procedures existed as far back as 2018, as admitted by Turn Key Medical Director and the Responsible Physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

197.  Turn Key knew that because their LPNs are not trained to assess a medical condition, they may not know that an inmate is suffering a medical condition that should be referred to an RN, nurse practitioner, or physician, as admitted by Turn Key Medical Director and the Responsible Physician for the Cleveland County jail, Dr. William Cooper, D.O., in a deposition given in the case *Thompson v. Norman*

*Regional Hospital Authority, et al.*, U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP on February 8, 2021.

198.     Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

**Deliberate indifference to the failure to train**

199.     Defendant Turn Key also failed to adequately train subordinates including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, in relation to the tasks they must perform, pursuant to the policies, practices, and or customs outlined above.

200.     As noted previously, Defendants County, Amason, and/or Glasco delegated policy-making authority to Defendant Turn Key and, therefore, the training and supervision policies, customs, and practices – or lack thereof – of Turn Key are the official policies, practices, and customs of Defendants County, Amason, and/or Glasco.

201.     Turn Key's failures in training include:

   a. Not training its employees/nurses as to the specific policies and procedures of each jail it operates in, specifically including the Cleveland County jail, despite Turn Key's training materials indicating that such training is to be performed and despite Cleveland County's expectations that medical staff perform periodic sight checks of inmates with heightened medical needs;

b. Not training lower-level providers and not supervising lower-level providers pertaining to the referral of patients for medication compliance counseling as required by Turn Key's policies;

c. Failing to train Wilson, Musgrove, Nunez, McGuire, Chance, Morris, Jankiewicz, and Sagin on when and what conditions warrant contacting a higher-level on-call or outside medical provider for the assessment, diagnosis, and treatment of detainees with serious, chronic medical conditions, including congestive heart failure and its accompanying medical conditions and complications;

d. Failing to train medical intake personnel at the jail to obtain necessary, relevant medical records for detainees with a diagnosed, chronic, medical condition, including congestive heart failure;

e. Detention of seriously, chronically ill detainees in the Cleveland County Jail without access to the diagnostic equipment and laboratory services obviously needed to manage those conditions;

f. The failure to train jail medical employees on when and how to obtain assessment and evaluation of an inmate's serious medical needs from more qualified medical providers as dictated by both the standard of care within the field of nursing and within the specific field of correctional health care;

g. The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as consistently monitoring a detainee's vital signs or weight, are not being followed by nursing staff at all;

h. Failing to train jail medical staff responsible for administering medications on the importance of actually providing medications to detainees who repeatedly complain of being unable to move – especially when they have a serious, chronic medical condition, such as congestive heart failure, which can cause mobility problems – rather than simply noting the complaints of being unable to move as refusal of medications;

i. Failing to supervise the administration of medication to ensure that detainees are properly receiving their medication in compliance with physicians' orders;

j. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees;

k. Failing to supervise the administration of medication to ensure that medication administration records are filled out truthfully and correctly; and/or

l. Not training lower-level providers and not supervising lower-level providers pertaining to the referral of patients for medication compliance counseling as set out in Turn Key's policies.

202. These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise

medical staff in the assessment and care of inmates with complex serious medical needs.

203.     Turn Key knew or should have known that jailers and medical personnel, including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, frequently encounter and detain individuals with serious, chronic medical conditions such as congestive heart failure.

204.     Turn Key knew or should have known that jailers and medical personnel, including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, require training in order to adequately identify, evaluate, and treat serious, chronic medical conditions, such as congestive heart failure and its accompanying complications and conditions.

205.     Turn Key knew or should have known that its failure to adequately train jailers and medical personnel under its exercise of control, including Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, posed a substantial and excessive risk to the health and safety of detainees, including Osborne, and would inevitably result in unconstitutional deprivation of medical of the type that Osborne suffered.

**Deliberate indifference to the need for supervision**

206.     As noted previously, Defendants County, Amason, and/or Glasco delegated policymaking authority to Defendant Turn Key and therefore the supervision policies and/or customs adopted by Defendant Turn Key are the official policies and/or customs of Defendants County, Amason, and/or Glasco.

207.     Defendant Turn Key knew or should have known that jailers and medical personal at the jail frequently encounter detainees with severe, chronic medical issues, including congestive heart failure.

208.     Defendant Turn Key knew or should have known that jailers and medical personnel at the jail require supervision in order to adequately identify, respond to, and detain individuals with heightened medical needs due to a diagnosed, serious, chronic medical conditions, including congestive heart failure.

209.     Defendant Turn Key knew or should have known that its failure to adequately supervise jailers and medical personnel under its exercise of control posed a substantial and excessive risk to the health and safety of detainees such as Terrance and would inevitably result in unconstitutional deprivations of medical care of the type Terrance suffered.

210.     Defendant Turn Key's failures in supervision include:

   a. Failing to supervise the administration of medication to ensure that medication administration records are filled out truthfully and correctly; and/or

   b. Not training lower-level providers and not supervising lower-level providers pertaining to the referral of patients for medication compliance counseling as required by Turn Key's policies.

   c. The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as consistently monitoring a detainee's vital signs or weight, are not being followed by nursing staff at all;

d. Failing to supervise nursing staff's care of detainees to ensure that serious, chronic conditions, including congestive heart failure, are being properly referred to more qualified providers for assessment, diagnosis, and treatment of accompanying conditions and/or complications;

e. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees;

f. Failing to supervise the keeping of medical records and charts of detainees under Turn Key's medical care to ensure that necessary, relevant medical records are requested and obtained for detainees with a diagnosed, chronic, medical condition, including congestive heart failure;

g. Failing to supervise the care of detainees under Turn Key's care to ensure that detainees are seen for follow up evaluations by properly qualified medical providers in a timely manner in compliance with the orders of outside physicians that Turn Key has taken a detainee to for emergency medical care;

h. The failure to supervise nursing staff to identify and/or rectify when medical records clearly indicate that orders, such as consistently monitoring a detainee's vital signs or weight, are not being followed by nursing staff at all;

i. Failing to supervise the administration of medication to ensure that detainees are properly receiving their medication in compliance with physicians' orders;

j. Failing to perform any evaluation or assessment of the actual skills and knowledge of new hire nurses to ensure they are capable of performing the tasks delegated to them – and that they can properly determine when to refer care to a higher-level medical provider – for the care and safety of detainees;

k. Failing to supervise the administration of medication to ensure that medication administration records are filled out truthfully and correctly; and/or

l. Not training lower-level providers and not supervising lower-level providers pertaining to the referral of patients for medication compliance counseling as set out in Turn Key's policies.

211.    These failures stem from the chronic unavailability of an on-site or responsible, reviewing physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex serious medical needs.

212.    Turn Key's inadequate or non-existent policies, practices, and customs as described herein have resulted in deaths or negative medical outcomes in numerous cases, in addition to Mr. Osborne's.

213.    In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle

with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

214.     In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

215.     In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs

of a sinus infection in Mr. Autry were ignored until he nearly died and ultimately had to have brain surgeries to save his life.

216.    In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

217.    In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

218.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

219.    Throughout the period from June through October 2019, Defendant Pata, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland

County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV medications, and the names of those medication. When Defendant Pata finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

220.     In June 2016, Turn Key failed to conduct an initial health assessment of Anthony Huff which resulted in the inmate being booked in without prescribed medications for heart disease, hypertension, coronary artery disease, and depression. Subsequently, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while he was hallucinating and kept in a restraint chair for more than 48 hours. Instead of appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

221.     An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while

ostensible under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

222. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

223. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

224. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle

several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his <u>clinical deterioration went unrecognized and untreated</u> until he was nearly completely quadriplegic.* (emphasis added)

225.     On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

226.     In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious, and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

227.     There are further examples of detainees suffering constitutional deprivations at the hands of Turn Key:

a. *Mayfield v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

b. *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

c. *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

d. *Sawyers v. Edwards*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

e. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

f. *Smith v. Board of County Commissioners of Muskogee County*, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon

bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

g. *Foutch v. Turn Key Health, LLC*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

h. *Sanders v. Creek County Board of County Commissioners*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure,

acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

i.  *Allen v. Maruf*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

j.  *Ellis v. Brown*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

k.  *Yancy v. Turn Key Health*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

l. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

m. *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

n. *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete

wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

o. *Bowen v. Ring,* U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

p. *Thompson v. Turn Key Health Clinics, LLC,* U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

q. *Buchanan v. Turn Key Health Clinics, LLC,* U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key

was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

r.  *Avery v. Turn Key Health Clinics, LLC,* U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

s.  *Sanders v. Gifford, et al.,* U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

t.  *Nabors v. Humphrey, et al.,* U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

u. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

v. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

w. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

x. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

y. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

z. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist— which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against

cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

228.     By design, the Turn Key medical system was destined to fail.

229.     There is *one* physician, Dr. William Cooper, D.O., who was the "Medical Director" and "physician" for *all* of the correctional facilities in Oklahoma staffed by Turn Key. In an effort to cut costs, Turn Key spread Dr. Cooper far too thin making it impossible for him to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

230.     In essence, Dr. Cooper was a "traveling" or roving Medical Director, traveling all over the State to each of Turn Key's contracted jails for short blocks of time.

231.     While having one physician serve as the Medical Director for multiple large jails is obviously insufficient, there is no evidence that Dr. Cooper, or any other physician, has a practice of evaluating/treating inmates at all at the Cleveland County Jail.

232.     In other words, Turn Key had a policy, practice, or custom of inadequately staffing county jails, including the Cleveland County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor, or treat inmates, like Mr. Osborne, with complex and serious medical needs and symptoms, including shortness of breath, chest pains, edema, anasarca, ascites, weeping legs, skin sloughing off of legs, substantial weight gain due to fluid retention, urinary incontinence, facial swelling, pressure ulcers, and serious infection.

233.   This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

234.   The aforementioned policies, practices, and or customs promulgated, created, and/or utilized by Defendant Turn Key, and thereby the official policies, practices, and/or customs of Defendants County, Amason, and/or Glasco were promulgated, created, and/or utilized in conscious disregard of the obvious substantial risks of serious harm to detainees such as Osborne and were the direct and proximate cause of Terrance's deprivation of medical care which caused and/or contributed to his death.

235.   The aforementioned policies, practices, and/or customs promulgated, created, and/or utilized by Defendant Turn Key, and thereby the official policies of Defendants County, Amason, and/or Glasco, were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations and were the direct and proximate cause of Osborne's avoidable and unnecessary physical pain, severe emotional distress, mental anguish, loss of his life, and all other damages alleged herein.

236.   The aforementioned policies, practices, and/or customs promulgated, created, and/or utilized by Defendant Turn Key, and thereby the official policies of Defendants County, Amason, and/or Glasco were promulgated, created, and/or utilized with conscious disregard of a substantial risk of serious harm and constitutional violations, and were the direct and proximate cause of damages

suffered by Osborne's heirs, including but not limited to, pecuniary loss (including lost wages), grief, loss of companionship, pain and suffering.

**Ratification**

237.    Defendant Dr. William Cooper, the Medical Director and responsible/supervising physician for Defendant Turn Key, is the final policy and decisionmaker for Defendant Turn Key on the medical protocols and treatment of patients under Turn Key's care and the hiring and firing of medical staff, such that his decisions and actions are attributable to Defendant Turn Key.

238.    In the alternative, Defendant Turn Key retained policy and decision-making authority on the medical protocols and treatment of patients under Turn Key's care.

239.    Alternatively to paragraphs 29-31, Defendant Cooper and/or Defendant Turn Key were aware of and reviewed the medication administration, medical records, and treatment for Terrance throughout the time he was detained, pursuant to the responsibility to review and supervise the actions of all lower-level providers in the provision of care. Throughout that time and after Osborne's death, Cooper and/or Turn Key ratified the actions and decisions of lower-level personnel and chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, such that the actions of those employees are attributable to Defendant Turn Key.

240.    After Terrance's death, Defendant Cooper and/or Defendant Turn Key conducted a mortality review of Terrance's medical treatment and conditions, and in

doing so chose not to take any action to discipline, retrain, terminate, or otherwise correct the conduct of Wilson, Musgrove, Pata, Nunez, McGuire, Chance, Morris, Jankiewicz, Bruce, and Sagin, such that the actions of those employees is attributed to Defendant Turn Key.

241. This ratification of the actions of Turn Key's medical staff in the jail by Defendant Cooper and/or Defendant Turn Key was made with full knowledge of:

a. The failure of Turn Key personnel to obtain any of Osborne's relevant medical records for his chronic, serious, diagnosed condition of congestive heart failure;

b. That it took multiple days after Osborne arrived at the F. DeWayne Beggs Detention Center before anyone began administering his prescribed medications to him despite having knowledge of his chronic, serious, and life-threatening medical condition;

c. The failures of Turn Key personnel to provide Osborne his potentially life-saving medications when he reported he could not get up despite the documented knowledge that Osborne had serious mobility issues, required a wheelchair, had very edematous legs, skin sloughing off of his legs, infection in his legs, foul odors coming off of his leg wounds, and pressure-type ulcers on his perineum, and that rather than provide those medications, Turn Key personnel simply claimed Osborne was refusing his medications;

d. The failures of Turn Key personnel to have Osborne seen by the proper level of medical providers in a timely manner in accord with the orders of outside physicians Turn Key personnel took Osborne to for emergency treatment;

e. The failures of Turn Key personnel to take Osborne back to the emergency room when his condition had severely declined, including substantial weight gain, severe edema, anasarca and ascites, the sloughing off of skin on his legs, infection in his legs, foul odors coming from his legs, his repeated complaints of chest pain and shortness of breath, his face being so swollen/edematous that he could not see, his repeated requests to go to the hospital;

f. The failure of Turn Key's lower-level providers - who perform the vast majority of day-to-day care and treatment for inmates – to follow the explicit orders of higher-level Turn Key personnel to monitor Osborne's weight closely and with full knowledge of this standard protocol for patients with congestive heart failure and the risks to the patient's health indicated by such weight gain;

g. That Osborne required frequent care, evaluation, and treatment from providers more qualified than LPNs but that the majority of his treatment was delegated to LPNs, that tasks were being delegated to LPNs outside of their legal scope of practice, that no one within Turn Key had ever performed any assessment or evaluations of the skill level of individual nursing employees to ensure they could perform the tasks delegated to them, and that Osborne was only seen 2 times by a Physician's Assistant or Nurse Practitioner, and was

never seen by a physician other than the one time he was taken to the emergency room prior to November 14, even though Osborne was present in the Cleveland County Jail for 24 days;

242.     The ratification of the actions of Turn Key's subordinates, with the knowledge set out above of those actions, the reasons for those actions, and the risks of constitutional violations presented by those actions, evidences Turn Key policies and procedures that Turn Key's subordinates followed in their failures to treat Terrance Osborne, that those policies and procedures were the moving force behind denying Terrance adequate medical care and evidences deliberate indifference to the risks of constitutional violations presented by those policies and procedures.

### THIRD CAUSE OF ACTION:
### DELIBERATELY INDIFFERENT POLICIES, PRACTICES, AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT COUNTY

243.     Defendant County retains supervisory and final authority over the contracting for medical services at the Cleveland County Jail, with any contract for such services at the jail requiring approval of the Board of County Commissioners.

244.     In exercise of this role, County is responsible for the effects of its own policy decisions which violate the Constitutional rights of citizens, including detainees at the Cleveland County Jail.

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

245.     In an effort to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-sufficient and humane medical care, County has

continually renewed its contract with Turn Key Health Clinics, LLC, ignoring Turn Key's record of deliberate indifference to the serious medical needs of inmates at the Cleveland County Jail and at numerous other jails where Turn Key operates:

   a. In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

   b. In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood

pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

c. In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs of a sinus infection in Mr. Autry were ignored until he nearly died and ultimately had to have brain surgeries to save his life.

d. In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

e. In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

f. In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

g. Throughout the period from June through October 2019, Defendant Pata, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV medications, and the names of those medication. When Defendant Pata finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead

requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

h. In June 2016, Turn Key failed to conduct an initial health assessment of Anthony Huff which resulted in the inmate being booked in without prescribed medications for heart disease, hypertension, coronary artery disease, and depression. Subsequently, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while he was hallucinating and kept in a restraint chair for more than 48 hours. Instead of appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

i. An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensible under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

j. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

k. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.

Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

l.  In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his <u>clinical deterioration went unrecognized and untreated</u> until he was nearly completely quadriplegic.* (emphasis added)

m.  On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee

over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

246.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious, and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

247.    There are further examples of detainees suffering constitutional deprivations at the hands of Turn Key:

   a. *Mayfield v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

   b. *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

c. *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

d. *Sawyers v. Edwards,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

e. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on

him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

f. *Smith v. Board of County Commissioners of Muskogee County*, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

g. *Foutch v. Turn Key Health, LLC*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further

alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

h. *Sanders v. Creek County Board of County Commissioners,* U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

i. *Allen v. Maruf,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the

Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

j. *Ellis v. Brown*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

k. *Yancy v. Turn Key Health*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

l. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's

deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

m. *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

n. *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

o. *Bowen v. Ring*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to

deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

p. *Thompson v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

q. *Buchanan v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.


IN THE DISTRICT COURT OF CLEVELAND COUNTY
STATE OF OKLAHOMA

PART B

STATE OF O
CLEVELAND COUNTY J ~~~

FILED

JUN 29 2022

In the office of the
Court Clerk MARILYN WILLIAMS

(1) SHAUNTAE OSBORNE-
FRANKLIN, as Personal
Representative of the Estate of
Terrance Lavon Osborne,

      Plaintiff,

v.

Case No. CJ-2022-732

ATTORNEY LIEN CLAIMED

(1) BOARD OF COUNTY
COMMISSIONERS OF
CLEVELAND COUNTY;
(2) CHRIS AMASON, in his
individual and official capacities;
(3) BLAKE GREEN, in his
individual capacity;
(4) JAMES GLASCO, individually
and in his capacity as Captain
and jail administrator;
(5) JOHN AND JANE DOE
JAILERS 1-9;
(6) BRANDY GARNER;
(7) TURN KEY HEALTH
CLINICS, LLC, a domestic
limited liability company;
(8) TARA WILSON, an individual;
(9) NICOLE MUSGROVE, an
individual;
(10) BECKY PATA, an individual;
(11) SARAH NUNEZ, an individual;
(12) DEREK MCGUIRE, an
individual;
(13) SARAH CHANCE, an
individual;
(14) ALANA MORRIS, an
individual;
(15) BRITTANY JANKIEWICZ, an
individual;
(16) REBECCA BRUCE, an
individual;
(17) DAVID SAGIN, an individual;

r. *Avery v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

s. *Sanders v. Gifford, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

t. *Nabors v. Humphrey, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

u. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

v. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

w. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

x. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

y. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed

to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

z. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist— which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

248.    The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

249.    As a result of his choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful

swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

250.     As a result of his choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

251.     As a result of his choice to continue to use Turn Key in the Cleveland County Jail, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

252.     Further, County is complicit in Turn Key's deliberately indifferent policies and procedures that focus on cost-saving over providing constitutionally-required medical care, as evidenced by the provision of County's contract with Turn Key wherein County is responsible for outside medical care costs in excess of $50,000, with Turn Key being responsible for that portion.

253.     This policy encourages Turn Key to under-utilize necessary outside medical care costs in order to prevent costing County more money than they already pay Turn Key under the contract.

254.     This policy further encourages Turn Key to under utilize necessary outside medical care costs in order to limit County's financial exposure for outside medical costs in excess of $50,000.

255.     In its efforts to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-required medical care, County encourages and

ratifies Turn Key's policies and acts which purposefully under-utilize outside medical care and specialty care for seriously and/or chronically-ill inmates at the Cleveland County Jail.

256.     As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

257. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

258. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## FOURTH CAUSE OF ACTION:
## DELIBERATELY INDIFFERENT POLICIES, PRACTICES, AND CUSTOMS, AND DELIBERATELY INDIFFERENT TRAINING AND SUPERVISION IN VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANT AMASON

Plaintiff incorporates all previous statements and allegations as set out herein:

259.     Defendant Amason retains supervisory and final authority over the contracting for medical services at the Cleveland County Jail.

260. In exercise of this role, Amason is responsible for the effects of his own policy decisions which violate the Constitutional rights of citizens, including detainees at the Cleveland County Jail.

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

261. In an effort to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-sufficient and humane medical care, Amason has continually renewed the contract with Turn Key Health Clinics, LLC, ignoring Turn Key's record of deliberate indifference to the serious medical needs of inmates at the Cleveland County Jail and at numerous other jails where Turn Key operates:

   a. In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate

recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

b. In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

c. In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs of a sinus infection in Mr. Autry were ignored until he nearly died and ultimately had to have brain surgeries to save his life.

d. In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

e. In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

f. In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

g. Throughout the period from June through October 2019, Defendant Pata, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not

seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV medications, and the names of those medication. When Defendant Pata finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

h. In June 2016, Turn Key failed to conduct an initial health assessment of Anthony Huff which resulted in the inmate being booked in without prescribed medications for heart disease, hypertension, coronary artery disease, and depression. Subsequently, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while he was hallucinating and kept in a restraint chair for more than 48 hours. Instead of appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

i. An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensible under the care of Turn Key medical staff. The Office of the

Chief Medical Examiner found the man had experienced a seizure in the days before his death.

j.  A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

k.  Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

l.  In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

[Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.* (emphasis added)

m. On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

262. In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious, and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

263.    There are further examples of detainees suffering constitutional deprivations at the hands of Turn Key:

   a.  *Mayfield v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

   b.  *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

   c.  *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

   d.  *Sawyers v. Edwards,* et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff

filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

e. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

f. *Smith v. Board of County Commissioners of Muskogee County,* U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the

obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

g. *Foutch v. Turn Key Health, LLC*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

h. *Sanders v. Creek County Board of County Commissioners*, U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully

incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

i. *Allen v. Maruf,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

j. *Ellis v. Brown,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

k. *Yancy v. Turn Key Health,* et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant

amount of blood in stool causing the plaintiff prolonged pain from his conditions.

l. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

m. *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

n. *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress,

and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

o. *Bowen v. Ring*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

p. *Thompson v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

q. *Buchanan v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation,

schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

r.  *Avery v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

s.  *Sanders v. Gifford, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

t.  *Nabors v. Humphrey, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

u. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

v. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

w. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

x. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

y. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

z. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist— which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against

cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

264.     The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

265.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

266.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

267.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

268.     Further, Amason is complicit in Turn Key's deliberately indifferent policies and procedures that focus on cost-saving over providing constitutionally-required medical care, as evidenced by the provision of the contract with Turn Key wherein

Amason is responsible for outside medical care costs in excess of $50,000, with Turn Key being responsible for that portion.

269.    This policy encourages Turn Key to under-utilize necessary outside medical care costs in order to prevent costing Amason more money than they already pay Turn Key under the contract.

270.    This policy further encourages Turn Key to under-utilize necessary outside medical care costs in order to limit Amason's financial exposure for outside medical costs in excess of $50,000.

271.    In its efforts to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-required medical care, Amason encourages and ratifies Turn Key's policies and acts which purposefully under-utilize outside medical care and specialty care for seriously and/or chronically-ill inmates at the Cleveland County Jail.

272.    As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

273.    As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

274. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Deliberate indifference to the failure to train**

275. Amason maintains a policy and practice wherein regular sight checks, even for inmates on medical observation such as Terrance, to ensure the safety of detainees at the Cleveland County Jail are performed primarily by detention officers.

276. These detention officers are provided no training as to how to conduct these sight checks and with no training as to the types of conditions or symptoms that warrant those detention officers calling for medical attention for a specific detainee.

277. As far back as January 2018, detention officers were conducting medical observation sight checks in a cursory manner with sight checks mostly being done in less than one second, with detention officers simply flipping open and then immediately closing the window on cells of detainees under medical observation for serious risks to the inmate's health and safety.

278. Despite the direct relationship of these medical observation sight checks to the health and safety of detainees with known serious medical conditions, detention officers are provided no formal or uniform training for this critical function, as testified to by multiple detention officers in depositions given in *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP.

279.     In his deposition in *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, Blake Green – the sheriff at the time of the actions at issue in this case – testified that from the event in *Thompson*, which occurred in January 2018, no changes had been made to remedy the lack of any training provided to detention officers for fulfilling the medical observation sight check function.

280.     In *Thompson*, the incorrect, cursory, and useless sight checks performed by detention officers led directly to the death and/or loss of chance of survival of decedent, Marconia Kessee, due to medical care not being provided to him despite him lying in a jail cell floor without moving for over two hours before anyone finally entered the cell to check on him.

281.     This decision not to train detention officers for this function was made with full knowledge that:

  a. The population of jail detainees includes a high number of chronic and/or seriously ill inmates who will require heightened and/or specialized medical care compared to the rest of the detainee population;

  b. Chronically-ill inmates require more frequent care and often require care that is time-sensitive and urgent;

  c. Jail policy had specific sight check procedures in place for detainees deemed to require frequent observation due to serious medical conditions that pose a serious risk to the detainees' health and safety; and

d. That at least one detainee – Marconia Kessee – had died as a result of the failure to train detention officers how to perform medical observation sight checks.

282. The failure to take any steps to train detention officers how to perform these sight checks, with full knowledge of the items set out in paragraph 198, constitutes deliberate indifference to the risks to detainees' health and safety by having the primary observations of inmates with identified serious medical risks performed by detention officers who have received no training on how to perform the sight checks or how to identify conditions that require:

1. Notifying jail medical staff of an urgent need for care;

2. Notifying supervisors of the failures of medical staff to provide care for obvious, serious conditions; and/or

3. Calling for outside, emergency medical care or transport to a hospital.

283. As a result of this failure to train, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

284. As a result of this failure to train, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

285. As a result of this failure to train, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Deliberate indifference to the need for supervision**

286. Amason retains supervisory authority over Turn Key and its employees pursuant to the policies of the Cleveland County Jail.

287. Such supervisory authority includes review of Turn Key's policies and procedures for the Cleveland County Jail, and the authority to dismiss and/or bar individual Turn Key employees from the Jail.

288. Such authority is evidenced by the dismissal and/or barring of Turn Key LPN Clayton Rickert after the events leading to the death of Marconia Kessee and the lawsuit *Thompson v. Norman Regional Hospital Authority, et al.*, U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, and such authority was acknowledged both by Turn Key – through its medical director Defendant Cooper – and Defendant Green in their depositions in that case.

289. Upon information and belief, pursuant to this supervisory authority, Amason was aware that Turn Key relies on LPNs to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

290. Upon information and belief, pursuant to this supervisory authority, Amason was aware that Turn Key does nothing to assess the skills and competency of those LPNs hired to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

291.    Upon information and belief, Amason took no actions to assess the skill and competency of the LPNs assigned to work at the Cleveland County Jail.

292.    This failure to supervise these employees to ensure they are capable of performing the tasks assigned to them – including the care of detainees with serious, life-threatening medical conditions – presented a serious risk of harm to detainees requiring care as they were left in the care of unqualified and untrained LPNs.

293.    The decision not to evaluate or assess these LPNs assigned to the Cleveland County Jail was made with full knowledge of the information set out above.

294.    The decision not to evaluate or assess the LPNs assigned to the Cleveland County Jail with the knowledge set out above constitutes deliberate indifference to the risks posed to detainees' health and safety as they were left in the care of unqualified and untrained LPNs.

295.    As a result of this failure to supervise, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

296. As a result of this failure to supervise, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

297. As a result of this failure to supervise, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## FIFTH CAUSE OF ACTION:
## INDIVIDUAL SUPERVISORY LIABILITY

Plaintiff incorporates all previous allegations and statements and further alleges as follows:

**Defendant Green**

298.     Defendant Green retains supervisory and final authority over the contracting for medical services at the Cleveland County Jail.

299.     In exercise of this role, Green is responsible for the effects of his own policy decisions which violate the Constitutional rights of citizens, including detainees at the Cleveland County Jail.

**Maintaining a policy, practice, and/or custom with deliberate indifference to the violation of detainees' constitutional right to medical care**

300.     In an effort to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-sufficient and humane medical care, Green has continually renewed the contract with Turn Key Health Clinics, LLC, ignoring Turn Key's record of deliberate indifference to the serious medical needs of inmates at the Cleveland County Jail and at numerous other jails where Turn Key operates:

   a.   In 2009, Lacee Danielle Marez was detained at the Cleveland County Jail. ESW Correctional Healthcare, now Turn Key Health Clinics, LLC, was the jail medical provider at the time. Marez, then 21, was taken into custody for missing a court appearance and allegedly struck her head on a concrete floor during a struggle with jail staff, causing a traumatic brain injury. Left in a holding cell for three days, Marez went into a coma and also suffered a heart attack, leading her to live in a permanent vegetative state. Marez repeatedly

asked for medical treatment over a period of several days. She began vomiting, urinating on herself, and laying lethargic on her cell bed. A critical care physician at Norman Regional Hospital wrote in a report filed with the court that jail medical staff neglected to treat Marez after a head injury. "Lack of medical care during this time indicates either direct disregard or inadequate recognition of this woman's progressive and ultimately nearly fatal illness," the doctor wrote.

b. In 2011, when Turn Key was still known as ESW Correctional Healthcare, Curtis Gene Pruett, 36, died in a holding cell at the Cleveland County Jail in October. He died after jail staff ignored his repeated pleas for emergency medical attention. Pruett was booked into the jail after police arrested him on suspicion of public intoxication. Pruett told jail staff that he had high blood pressure and that he was in severe pain, but they ignored his requests. Surveillance video showed Pruett doubled over clutching his chest at the jail, but ESW's nurse told him he was faking his condition. Pruett died of a heart attack.

c. In November 2014, Robert Autry nearly died while detained at the Cleveland County Jail after Turn Key employees ignored repeated complaints regarding a sinus infection Mr. Autry had contracted. Sinus infections were extremely dangerous and potentially life-threatening for Mr. Autry due to a prior traumatic brain injury. This information was disclosed to Turn Key and its employees and yet the obvious signs of a sinus infection in Mr. Autry were

ignored until he nearly died and ultimately had to have brain surgeries to save his life.

d. In 2015, Turn Key failed to schedule a psychological appointment with a doctor for James Jordanoff to regulate his medications and get the medications he had actually been prescribed for over two months.

e. In April 2016, Austin Vance died after being detained at the Cleveland County Jail. Vance died due to complications of excited delirium after he was denied medical care despite his obvious symptoms and his statements to arresting officers that he had taken Adderall. Instead of medical treatment, Vance was placed in a restraint chair and covered with a hood and remained there until he was found unresponsive. He was pronounced dead at the hospital shortly after.

f. In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to the profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County jailers were aware of the same symptoms and performed wholly inadequate, less than 1-second-long sight checks of Mr. Kessee throughout the last hours of his life. The Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

g. Throughout the period from June through October 2019, Defendant Pata, an employee of Turn Key, and other Turn Key medical personnel at the Cleveland County Jail failed to take any steps to obtain past medical and treatment information for an inmate who notified them of two chronic health conditions – HIV and hypertension. That inmate, Bryan Davenport, was not seen by a physician, physicians' assistant, or nurse practitioner for nearly a month after his arrival at the jail. Throughout that time, Davenport provided the names of his providers, his need for his HIV medications, and the names of those medication. When Defendant Pata finally saw Davenport, she informed him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring Davenport to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15 per visit.

h. In June 2016, Turn Key failed to conduct an initial health assessment of Anthony Huff which resulted in the inmate being booked in without prescribed medications for heart disease, hypertension, coronary artery disease, and depression. Subsequently, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while he was hallucinating and kept in a restraint chair for more than 48 hours. Instead of

appropriate medical treatment, the inmate was placed in a restraint chair where he remained until his death two days later.

i. An El Reno man died in 2016 after being found naked, unconscious, and covered in his own waste in a cell at the Canadian County Detention Center, while ostensible under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

j. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints – over several days – of breathing problems were disregarded by responsible staff, and he lost consciousness.

k. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself, or use the bathroom on his own. He

was forced to lay in his own urine and feces because the jail staff told Smith he was faking his paralysis and refused to help him.

l. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is 54-year-old gentlemen who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago... *He ended up finding himself in jail and it was during this time in jail that he had very significant deterioration in his neurologic status. [I]t s obvious that he likely developed beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his <u>clinical deterioration went unrecognized and untreated</u> until he was nearly completely quadriplegic.* (emphasis added)

m. On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

301.    In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious, and emergent medical conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

302.    There are further examples of detainees suffering constitutional deprivations at the hands of Turn Key:

a. *Mayfield v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 16-cv-736-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

b. *Moore v. Briann*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-115-BRW, wherein Turn Key was alleged to have ignored an inmates' worsening hip pain and disfunction for eleven months, leading to difficulty walking and constant severe pain.

c. *Wedsted v. Lowerily*, U.S. District Court for the Eastern District of Arkansas, Case No. 17-cv-263-BSM, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

d. *Sawyers v. Edwards*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-17-52-HE, wherein Turn Key was alleged to have been deliberately indifferent to the serious medical needs of Sawyers, a plaintiff whom had underwent emergency back surgery after an auto accident who had been transported to the Canadian County Detention Center. The

Turn Key staff received the medical records including Plaintiff's prescriptions and was also informed of the required two-week follow-up appointment, but failed to correctly administer Plaintiff's medications and failed to take Plaintiff to the required two-week follow-up appointment— which resulted in Plaintiff removing his own original dressing from surgery after five weeks. Plaintiff filed multiple requests for grievances and after two transfers saw his doctor for the follow-up visit eighty-nine days after surgery.

e. *Sam v. Virden,* et al., U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-415-TCK-FHM, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Sam, a detainee at Osage County Jail, who shattered his patella. Turn Key staff only provided ibuprofen and a medical request form to Sam two days later. After being detained at the Osage County Jail, Sam shattered his patella in a jail cell and then he was placed in isolation in order for the jail staff to "keep an eye on him." Three days later he received an x-ray and received no medical attention for ten days in which then only receives a knee brace. This was proceeded by another sixteen days of no medical attention, which resulted in the transfer of custody and led to an ultimate knee surgery.

f. *Smith v. Board of County Commissioners of Muskogee County*, U.S. District Court for the Eastern District of Oklahoma, Case no. 17-CV-90-KEW, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Smith, a cancer patient who had prostate cancer that had metastasized to his

spine and pelvic bone causing him to undergo intensive and aggressive radiation and other treatments. After being detained at the Muskogee County Jail, Smith developed symptoms such as severe pain in his back and chest, numbness and a frost-bite feeling in his chest that spread down to his feet, ultimately turning into numbness and permanent paralysis. Despite the obvious symptoms of severe medical distress, Turn Key failed and refused to provide adequate medical care or transport Smith to a hospital. Only upon bonding out of the jail did Smith receive adequate treatment; however, his paralysis was permanent.

g. *Foutch v. Turn Key Health, LLC,* U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-431-GKF-mjx, wherein Turn Key was alleged to have failed and refused to provide access to a physician for Foutch and failed and refused to place him under medical observation despite shortness of breath, difficulty breathing, and coughing up blood. Turn Key was further alleged to have failed to provide Foutch with the prescribed number of breathing treatments from an examining physician, and to have failed to provide any medical care as Foutch's condition obviously worsened over several days until Foutch was found unresponsive in his cell after foaming at the mouth and coughing up blood. Foutch was pronounced dead 2 minutes after arrival at a hospital.

h. *Sanders v. Creek County Board of County Commissioners,* U.S. District Court for the Northern District of Oklahoma, Case No. 17-cv-492-JHP-FHM, wherein

Turn Key was alleged to have ignored and failed to provide medical care to decedent Sanders despite noting that she had been suffering from diarrhea and her mental state had been rapidly declining for two to three weeks. Turn Key failed to seek appropriate medical care for Sanders until the 35th day after she entered the Creek County Jail, when they transported her to the hospital fully incapacitated and on the brink of death. At the hospital, Sanders was diagnosed with severe sepsis with shock, acute hypoxic respiratory failure, acute kidney injury, hepatopathy, and other serious conditions. Sanders died the day after arrival at the hospital.

i. *Allen v. Maruf*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-00863-SWW-JTR, wherein Turn Key was alleged to have refused to provide Allen, a jail detainee in Pulaski County Regional Detention Center, with medications that he had took since February of 2017 for degenerative bones, knee problems, disc problems, and also to keep the Plaintiff's arms, hands, legs, and feet from going numb that was prescribed by the Plaintiff's Doctor at the VA Hospital. Turn Key also denied the approval of a walking cane to prevent the plaintiff from falling.

j. *Ellis v. Brown*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-545, wherein Turn Key was alleged to have denied medications for the plaintiff's diagnosed neuropathy, instead only providing medication for heartburn based on the Turn Key nurse's statements that she knew that was all the plaintiff's condition was.

k. *Yancy v. Turn Key Health*, et al., U.S. District Court for the Eastern District of Arkansas, Case No. 4:17-cv-455, wherein Turn Key was alleged to have denied access to appropriate medical care with existing medical condition involving internal bleeding despite obvious signs of medical need including significant amount of blood in stool causing the plaintiff prolonged pain from his conditions.

l. *Alexander v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-0046-BSM, wherein the inmate was alleged to have been 100% disabled, and suffered sickle cell anemia, asthma, and rheumatoid arthritis, conditions which were alleged to have been disclosed to Turn Key. The inmate was alleged to have been cold, shaking and had been throwing up. Turn Key's nurse was alleged to have disregarded calls for medical help by the inmate and deputies, including denying plaintiff her "asthma pump." On December 14, 2016, allegedly as a result of Turn Key's deliberate indifference to the inmate's medical needs, the inmate began convulsing and having difficulty breathing. The inmate died as a result.

m. *McDonald v. Carpenter*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's anxiety medication needs, leading to elevated anxiety and an attempted suicide.

n. *Royston v. Board of County Commissioners of the County of Bryan*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-265-RAW, wherein Turn

Key was alleged to have failed to provide 24-hour access to a physician or midlevel provider for the Bryan County jail, failed to conduct a medical intake screening, failed to provide any care from a mental health provider, physician, midlevel provider, or a registered nurse despite obvious signs of medical distress, and failed to provide medical care after Royston hit her head against a concrete wall and despite obvious signs of injury all over Royston's body. Royston ultimately fell into a coma for several days.

o. *Bowen v. Ring*, U.S. District Court for the Eastern District of Arkansas, Case No. 18-cv-172-SWW, wherein plaintiff alleged he was severely beaten by an officer during his arrest. At the jail, Turn Key was alleged to have been deliberately indifferent to obvious signs of severe brain injury and to have delayed medical care which was alleged to have resulted in permanent brain damage. Turn Key was alleged to have poorly trained and equipped its LPN to deal with critical, but predictable medical emergencies, commonly encountered in a jail setting.

p. *Thompson v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5092-PKH, wherein Turn Key was alleged to have refused to administer plaintiff's prescription medications and refused to treat plaintiff's broken bones.

q. *Buchanan v. Turn Key Health Clinics, LLC*, U.S. District Court for the Eastern District of Oklahoma, Case No. 18-CV-171-RAW, wherein Turn Key was alleged to have failed and refused to provide medical observation, evaluation

or access to medical care despite Buchanan's paralysis in his left arm beginning the day after his arrival at the Muskogee County Detention Center. Four days later Buchanan developed paralysis in his right arm. Despite these obvious signs of medical distress, Turn Key did not move him to medical observation, schedule an appointment with a physician, or even check his vitals. Turn Key was alleged to essentially have provided no care to Buchanan even days later when Buchanan suffered paralysis of both legs as well. Turn Key medical staff was alleged to have failed and refuse to provide appropriate and immediate medical assistance when a Turn Key nurse finally evaluated Buchanan and noted his paralysis. Nine hours after that evaluation, another Turn Key nurse evaluated Buchanan and finally sent him to the hospital where he was diagnosed with quadriplegia and a cervical epidural abscess. Buchanan suffered permanent injury and paralysis as a result of Turn Key's failures.

r. *Avery v. Turn Key Health Clinics, LLC*, U.S. District Court for the Western District of Arkansas, Case No. 18-cv-5075-PKH, wherein Turn Key was alleged to have been deliberately indifferent to an inmate's severe dental needs.

s. *Sanders v. Gifford, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-712, wherein Turn Key was alleged to have repeatedly given Sanders another inmate's medication, resulting in seizures, vomiting, and pain to the Plaintiff.

t. *Nabors v. Humphrey, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:18-cv-664, wherein Turn Key was alleged to have given

inmate wrong amount of seizure medication, resulting in seizures and a busted lip. Inmate was ultimately taken to hospital twice, and had physical therapy prescription for trouble walking. Turn Key was alleged to have only provided a cane with no physical therapy.

u. *Lee v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

v. *Price v. Holladay*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-178-LPR, wherein Turn Key was alleged to have caused the death of an inmate with a known seizure disorder by failing to provide the inmate's prescription anti-seizure medication, improperly medicating the inmate with a anti-psychotic medication and then allowing the inmate to be placed in a restraint chair with a spit mask after he had been pepper sprayed, all in deliberate disregard of the inmate's obvious medical conditions. The inmate went into cardiac arrest and died.

w. *Davis v. Pulaski County, Arkansas*, U.S. District Court for the Eastern District of Arkansas, Case No. 19-cv-643-JM, wherein Turn Key was alleged to have

deliberately disregarded plaintiff's severe medical condition by failing to provide plaintiff with necessary insulin causing a significant drop in plaintiff's blood sugar which caused plaintiff injuries, including a broken ankle which had to be surgically repaired with hardware.

x. *Causey v. Pulaski County Medical, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-305, wherein Turn Key was alleged to have denied proper prescribed pain medications to partially paralyzed inmate with multiple injuries and chronic conditions. Turn Key was alleged to have failed to provide corrective footwear for inmate with injury to left foot, resulting in a fall and his left foot healing improperly.

y. *Winningham v. Roberts, et al.*, U.S. District Court for the Eastern District of Arkansas, Case No. 4:19-cv-706, wherein Turn Key was alleged to have failed to provide treatment to inmate reporting a separated shoulder joint and/or broken clavicle after falling out of bunk bed.

z. *Bowlds v. Turn Key Health*, et al., U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-726-SLP, wherein Turn Key was alleged to have been deliberately indifferent to the medical needs of Bowlds, a pretrial detainee at the Logan County Detention Center, when they refused to allow him access to the dentist— which resulted in acute pain. Bowlds experienced an extreme headache which lasted twenty-four hours due to a chipped tooth which allegedly left an exposed nerve. Turn Key only gave Bowlds the option to complete several treatments of medication prior to even being considered

to see a dentist— which can take up to ninety days, unless Bowlds paid for the dentist visit with his own money, which he did not have the means to do. Turn Key was also alleged to have violated the 8th Amendment ban against cruel and unusual punishment and the 14th Amendment of the U.S. Constitution.

303.     The choice to continue to retain Turn Key with its lengthy record of denying inmates necessary medical care and detainee-patient abuse, was made with deliberate indifference to the known and obvious risk Turn Key poses to the safety and health of detainees unfortunate enough to be left under its care.

304.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

305.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

306.     As a result of this choice to continue to use Turn Key in the Cleveland County Jail, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

307. Further, Green is complicit in Turn Key's deliberately indifferent policies and procedures that focus on cost-saving over providing constitutionally-required medical care, as evidenced by the provision of the contract with Turn Key wherein the jail/County/Amason is responsible for outside medical care costs in excess of $50,000, with Turn Key being responsible for that portion.

308. This policy encourages Turn Key to under-utilize necessary outside medical care costs in order to prevent costing Amason more money than they already pay Turn Key under the contract.

309. This policy further encourages Turn Key to under-utilize necessary outside medical care costs in order to limit the jail/County/Amason's financial exposure for outside medical costs in excess of $50,000.

310. In its efforts to prioritize cost-cutting over ensuring detainees at the Cleveland County Jail receive constitutionally-required medical care, Green encourages and ratifies Turn Key's policies and acts which purposefully under-utilize outside medical care and specialty care for seriously and/or chronically-ill inmates at the Cleveland County Jail.

311. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

312. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

313. As a result of this policy of deliberately under-utilizing outside and specialty medical care, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Deliberate indifference to the failure to train**

314. Green maintained a policy and practice wherein regular sight checks, even for inmates on medical observation such as Terrance, to ensure the safety of detainees at the Cleveland County Jail are performed primarily by detention officers.

315. These detention officers are provided no training as to how to conduct these sight checks and with no training as to the types of conditions or symptoms that warrant those detention officers calling for medical attention for a specific detainee.

316. As far back as January 2018, detention officers were conducting medical observation sight checks in a cursory manner with sight checks mostly being done in less than one second, with detention officers simply flipping open and then immediately closing the window on cells of detainees under medical observation for serious risks to the inmate's health and safety.

317. Despite the direct relationship of these medical observation sight checks to the health and safety of detainees with known serious medical conditions, detention officers are provided no formal or uniform training for this critical function, as testified to by multiple detention officers in depositions given in *Thompson v. Norman*

*Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP.

318.    In his deposition in *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, Blake Green – the sheriff at the time of the actions at issue in this case – testified that from the event in *Thompson,* which occurred in January 2018, no changes had been made to remedy the lack of any training provided to detention officers for fulfilling the medical observation sight check function.

319.    In *Thompson,* the incorrect, cursory, and useless sight checks performed by detention officers led directly to the death and/or loss of chance of survival of decedent, Marconia Kessee, due to medical care not being provided to him despite him lying in a jail cell floor without moving for over two hours before anyone finally entered the cell to check on him.

320.    This decision not to train detention officers for this function was made with full knowledge that:

      a. The population of jail detainees includes a high number of chronic and/or seriously ill inmates who will require heightened and/or specialized medical care compared to the rest of the detainee population;

      b. Chronically-ill inmates require more frequent care and often require care that is time-sensitive and urgent;

c. Jail policy had specific sight check procedures in place for detainees deemed to require frequent observation due to serious medical conditions that pose a serious risk to the detainees' health and safety; and

d. That at least one detainee – Marconia Kessee – had died as a result of the failure to train detention officers how to perform medical observation sight checks.

321.     The failure to take any steps to train detention officers how to perform these sight checks, with full knowledge of the items set out in paragraph 198, constitutes deliberate indifference to the risks to detainees' health and safety by having the primary observations of inmates with identified serious medical risks performed by detention officers who have received no training on how to perform the sight checks or how to identify conditions that require:

a. Notifying jail medical staff of an urgent need for care;

b. Notifying supervisors of the failures of medical staff to provide care for obvious, serious conditions; and/or

c. Calling for outside, emergency medical care or transport to a hospital.

322.     As a result of this failure to train, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

323. As a result of this failure to train, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

324. As a result of this failure to train, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Deliberate indifference to the need for supervision**

325.    Green retained supervisory authority over Turn Key and its employees pursuant to the policies of the Cleveland County Jail.

326.    Such supervisory authority includes review of Turn Key's policies and procedures for the Cleveland County Jail, and the authority to dismiss and/or bar individual Turn Key employees from the Jail.

327.    Such authority is evidenced by the dismissal and/or barring of Turn Key LPN Clayton Rickert after the events leading to the death of Marconia Kessee and the lawsuit *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, and such authority was acknowledged both by Turn Key – through its medical director Defendant Cooper – and Defendant Green in their depositions in that case.

328.    Upon information and belief, pursuant to this supervisory authority, Green was aware that Turn Key relies on LPNs to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

329.    Upon information and belief, pursuant to this supervisory authority, Green was aware that Turn Key does nothing to assess the skills and competency of those

LPNs hired to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

330.      Upon information and belief, Green took no actions to assess the skill and competency of the LPNs assigned to work at the Cleveland County Jail.

331.      This failure to supervise these employees to ensure they are capable of performing the tasks assigned to them – including the care of detainees with serious, life-threatening medical conditions – presented a serious risk of harm to detainees requiring care as they were left in the care of unqualified and untrained LPNs.

332.      The decision not to evaluate or assess these LPNs assigned to the Cleveland County Jail was made with full knowledge of the information set out above.

333.      The decision not to evaluate or assess the LPNs assigned to the Cleveland County Jail with the knowledge set out above constitutes deliberate indifference to the risks posed to detainees' health and safety as they were left in the care of unqualified and untrained LPNs.

334.      As a result of this failure to supervise, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

335. As a result of this failure to supervise, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

336. As a result of this failure to supervise, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Defendant Glasco**

337. Glasco maintains a policy and practice wherein regular sight checks, even for inmates on medical observation such as Terrance, to ensure the safety of detainees at the Cleveland County Jail are performed primarily by detention officers.

338. These detention officers are provided no training as to how to conduct these sight checks and with no training as to the types of conditions or symptoms that warrant those detention officers calling for medical attention for a specific detainee.

339. As far back as January 2018, detention officers were conducting medical observation sight checks in a cursory manner with sight checks mostly being done in less than one second, with detention officers simply flipping open and then immediately closing the window on cells of detainees under medical observation for serious risks to the inmate's health and safety.

340. Despite the direct relationship of these medical observation sight checks to the health and safety of detainees with known serious medical conditions, detention officers are provided no formal or uniform training for this critical function, as testified to by multiple detention officers in depositions given in *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP.

341. In his deposition in *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP,

Blake Green – the sheriff at the time of the actions at issue in this case – testified that from the event in *Thompson*, which occurred in January 2018, no changes had been made to remedy the lack of any training provided to detention officers for fulfilling the medical observation sight check function.

342.     In *Thompson*, the incorrect, cursory, and useless sight checks performed by detention officers led directly to the death and/or loss of chance of survival of decedent, Marconia Kessee, due to medical care not being provided to him despite him lying in a jail cell floor without moving for over two hours before anyone finally entered the cell to check on him.

343.     This decision not to train detention officers for this function was made with full knowledge that:

   a. The population of jail detainees includes a high number of chronic and/or seriously ill inmates who will require heightened and/or specialized medical care compared to the rest of the detainee population;

   b. Chronically-ill inmates require more frequent care and often require care that is time-sensitive and urgent;

   c. Jail policy had specific sight check procedures in place for detainees deemed to require frequent observation due to serious medical conditions that pose a serious risk to the detainees' health and safety; and

   d. That at least one detainee – Marconia Kessee – had died as a result of the failure to train detention officers how to perform medical observation sight checks.

344.    The failure to take any steps to train detention officers how to perform these sight checks, with full knowledge of the items set out in paragraph 198, constitutes deliberate indifference to the risks to detainees' health and safety by having the primary observations of inmates with identified serious medical risks performed by detention officers who have received no training on how to perform the sight checks or how to identify conditions that require:

   a. Notifying jail medical staff of an urgent need for care;

   b. Notifying supervisors of the failures of medical staff to provide care for obvious, serious conditions; and/or

   c. Calling for outside, emergency medical care or transport to a hospital.

345.    As a result of this failure to train, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

346. As a result of this failure to train, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

347. As a result of this failure to train, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

**Deliberate indifference to the need for supervision**

348. Glasco retains supervisory authority over Turn Key and its employees pursuant to the policies of the Cleveland County Jail.

349. Such supervisory authority includes review of Turn Key's policies and procedures for the Cleveland County Jail, and the authority to dismiss and/or bar individual Turn Key employees from the Jail.

350. Such authority is evidenced by the dismissal and/or barring of Turn Key LPN Clayton Rickert after the events leading to the death of Marconia Kessee and the lawsuit *Thompson v. Norman Regional Hospital Authority, et al.,* U.S. District Court for the Western District of Oklahoma, Case No. CIV-19-113-SLP, and such authority was acknowledged both by Turn Key – through its medical director Defendant Cooper – and Defendant Green in their depositions in that case.

351. Upon information and belief, pursuant to this supervisory authority, Glasco was aware that Turn Key relies on LPNs to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

352. Upon information and belief, pursuant to this supervisory authority, Glasco was aware that Turn Key does nothing to assess the skills and competency of those LPNs hired to provide the majority of medical care to detainees, including those with serious and/or chronic medical conditions.

353. Upon information and belief, Glasco took no actions to assess the skill and competency of the LPNs assigned to work at the Cleveland County Jail.

354. This failure to supervise these employees to ensure they are capable of performing the tasks assigned to them – including the care of detainees with serious,

life-threatening medical conditions – presented a serious risk of harm to detainees requiring care as they were left in the care of unqualified and untrained LPNs.

355.     The decision not to evaluate or assess these LPNs assigned to the Cleveland County Jail was made with full knowledge of the information set out above.

356.     The decision not to evaluate or assess the LPNs assigned to the Cleveland County Jail with the knowledge set out above constitutes deliberate indifference to the risks posed to detainees' health and safety as they were left in the care of unqualified and untrained LPNs.

357.     As a result of this failure to supervise, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

358. As a result of this failure to supervise, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

359. As a result of this failure to supervise, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

### SIXTH CAUSE OF ACTION:
### DELIBERATE INDIFFERENCE SERIOUS MEDICAL NEEDS AGAINST JOHN AND JANE DOE JAILERS 1-9 AND BRANDY GARNER

360.     Each of the John Doe jailers and Brandy Garner were involved in the monitoring and performance of medical observation sight checks of Terrance during

the period of his detention, specifically during the period from DATE through November 14, 2020, when Terrance's signs of serious medical need - swelling and edema in Terrance's legs and ultimately in his face and body, including swelling to the extent that Terrance could not see, the foul odor coming from Terrance's legs, and the skin sloughing off of Terrance's legs along with fluid weeping from his legs, at the same time as the foul odor coming from Terrance's feet.

361.    Each of the John Doe jailers and Brandy Garner were aware of Terrance's serious medical risk and medical needs because he was placed on heightened medical observation requiring more frequent sight checks.

362.    Each of the John Doe jailers and Brandy Garner were aware of the serious medical needs and deteriorating condition as they saw the swelling and edema in Terrance's legs and ultimately in his face and body, including swelling to the extent that Terrance could not see.

363.    Each of the John Doe jailers and Brandy Garner were further were aware of the serious medical needs and deteriorating condition as they could smell the foul odor coming from Terrance's legs, and they could see the skin sloughing off of Terrance's legs along with fluid weeping from his legs, at the same time as the foul odor coming from Terrance's feet.

364.    Each of the John Doe jailers and Brandy Garner observed and were aware that nothing was being done for Terrance to treat the skin sloughing off of his feet, the fluid weeping from his legs, and the foul odor being emitted from his feet.

365.     Each of the John Doe jailers and Brandy Garner were further aware that Terrance repeatedly complained of shortness of breath, chest pains, and that he could not move, with Terrance also requiring the use of a wheelchair.

366.     Despite being aware of the obvious, serious medical need and risk Terrance presented, and despite being aware that medical staff was not doing anything to treat the skin sloughing off of Terrance's legs, with fluid weeping out of his legs and foul odor coming from his feet, each of the John Doe jailers and Brandy Garner did not raise any complaints or concerns to medical staff or their own supervisory officials regarding Terrance's obvious serious condition and lack of medical care.

367.     It was unreasonable for each of the John Doe jailers and Brandy Garner to ignore these obvious signs of medical risk and the obvious failure to provide any treatment for the serious medical condition Terrance exhibited.

368.     It was unreasonable for each of the John Doe jailers and Brandy Garner to simply defer to jail medical staff when it was obvious that Terrance was not receiving any treatment for his obvious medical needs.

369.     The decision to not seek outside or emergency medical attention for Terrance, to raise concerns about the complete lack of treatment of Terrance to medical staff or the jailers' supervisors, was made with full knowledge of Terrance's obvious and deteriorating condition and serious medical need, such that it constitutes deliberate indifference to the obvious, serious medical needs of Terrance and the obvious risk of harm presented to Terrance by his untreated conditions.

370.     As a result of these decisions not to act, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

371.     As a result of these decisions not to act, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

372.     As a result of these decisions not to act, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## SEVENTH CAUSE OF ACTION:
## NEGLIGENCE

373.     In the alternative to allegations that County acted with deliberate indifference, the actions of Defendant County, as set out above, were negligent in selecting to continue Turn Key's contract in the Cleveland County Jail and negligent in instituting contractual provisions that encourage under-utilization of outside and specialty medical care for inmates with serious, chronic medical conditions.

374.     As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful

swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

375. As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

376. As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

377. In the alternative to allegations that Amason acted with deliberate indifference, the actions of Defendant Amason, as set out above were negligent in:

   a. selecting to continue Turn Key's contract in the Cleveland County Jail;

   b. in instituting contractual provisions that encourage under-utilization of outside and specialty medical care for inmates with serious, chronic medical conditions;

   c. failing to supervise medical staff assigned to work in the Cleveland County Jail; and,

   d. failing to train detention officers charged with performing heightened, medical observation sight checks.

378. As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

379.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

380.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

381.    In the alternative to allegations that Green acted with deliberate indifference, the actions of Defendant Green, as set out above were negligent in:

   a. selecting to continue Turn Key's contract in the Cleveland County Jail;

   b. in instituting contractual provisions that encourage under-utilization of outside and specialty medical care for inmates with serious, chronic medical conditions;

   c. failing to supervise medical staff assigned to work in the Cleveland County Jail; and,

   d. failing to train detention officers charged with performing heightened, medical observation sight checks.

382.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

383. As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

384. As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

385. In the alternative to allegations that Glasco acted with deliberate indifference, the actions of Defendant Glasco, as set out above were negligent in:

   a. failing to supervise medical staff assigned to work in the Cleveland County Jail; and,

   b. failing to train detention officers charged with performing heightened, medical observation sight checks.

386. As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

387.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

388.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

389.    In the alternative to allegations that Turn Key acted with deliberate indifference, the actions of Defendant Turn Key, as set out above were negligent.

390.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

391.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

392.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

393.    In the alternative to allegations that Cooper acted with deliberate indifference, the actions of Defendant Cooper, as set out above were negligent.

394.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

395.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

396.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

397.    In the alternative to allegations that Pata acted with deliberate indifference, the actions of Defendant Amason, as set out above were negligent.

398.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

399.   As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

400.   As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

401.   In the alternative to allegations that Bruce acted with deliberate indifference, the actions of Defendant Bruce, constitute negligence as they fell below the standard of ordinary care for a person in Bruce's position.

402.   As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

403.   As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

404.   As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

405.   In the alternative to allegations that McGuire acted with deliberate indifference, the actions of Defendant McGuire, constitute negligence as they fell below the standard of ordinary care for a person in McGuire's position.

406.   As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

407.   As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

408.   As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

409.   In the alternative to allegations that Meza acted with deliberate indifference, the actions of Defendant Meza, constitute negligence as they fell below the standard of ordinary care for a person in Meza's position.

410.   As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

411.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

412.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

413.    In the alternative to allegations that Linton acted with deliberate indifference, the actions of Defendant Linton, constitute negligence as they fell below the standard of ordinary care for a person in Linton's position.

414.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

415.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

416.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

417.    In the alternative to allegations that Musgrove acted with deliberate indifference, the actions of Defendant Musgrove, constitute negligence as they fell below the standard of ordinary care for a person in Musgrove's position.

418.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

419.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

420.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

421.    In the alternative to allegations that Nunez acted with deliberate indifference, the actions of Defendant Nunez, constitute negligence as they fell below the standard of ordinary care for a person in Nunez's position.

422.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

423.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

424.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

425.    In the alternative to allegations that Wilson acted with deliberate indifference, the actions of Defendant Wilson, constitute negligence as they fell below the standard of ordinary care for a person in Wilson's position.

426.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

427.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

428.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

429.    In the alternative to allegations that Chance acted with deliberate indifference, the actions of Defendant Chance, constitute negligence as they fell below the standard of ordinary care for a person in Chance's position.

430.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

431.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

432.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

433.     In the alternative to allegations that Morris acted with deliberate indifference, the actions of Defendant Morris, constitute negligence as they fell below the standard of ordinary care for a person in Morris's position.

434.     As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

435.     As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

436.     As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

437.     In the alternative to allegations that Jankiewicz acted with deliberate indifference, the actions of Defendant Jankiewicz, constitute negligence as they fell below the standard of ordinary care for a person in Jankiewicz's position.

438.     As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum,

and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

439. As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

440. As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

441. In the alternative to allegations that Sagin acted with deliberate indifference, the actions of Defendant Sagin, constitute negligence as they fell below the standard of ordinary care for a person in Sagin's position.

442. As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

443. As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

444. As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

445. In the alternative to allegations that each of the John Doe Jailers acted with deliberate indifference, the actions of each of the John Doe Jailers, constitute negligence as they fell below the standard of ordinary care for a person in each of the John Doe Jailer's position.

446. As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

447. As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

448. As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

449. In the alternative to allegations that Garner acted with deliberate indifference, the actions of Defendant Garner, constitute negligence as they fell below the standard of ordinary care for a person in Garner's position.

450.    As a result of this negligence, made with deliberate indifference, Terrance suffered significant and substantial pain and suffering as a result of his worsening condition, including chest pains, shortness of breath, painful swelling/edema/anasarca/ascites, painful infection, pressure ulcers on his perineum, and extreme fatigue and inability to move because he was denied appropriate medical care and monitoring of his condition.

451.    As a result of this negligence, made with deliberate indifference, Terrance suffered a significant loss of his chance of survival and life expectancy because he was denied appropriate medical care and monitoring of his condition.

452.    As a result of this negligence, made with deliberate indifference, Terrance died prematurely because he was denied appropriate medical care and monitoring of his condition.

## CAUSATION OF PLAINTIFFS' INJURIES AND DAMAGES

453.    Plaintiff incorporates all previous allegations and statements as if fully restated herein.

454.    The injuries and damages sustained by Terrance Osborne, and his heirs, were produced in a natural and continuous sequence from defendants' violation of one or more of the above describe independent constitutional and/or state law duties.

455.    The injuries and damages sustained by Terrance Osborne, and his heirs, were a probable consequence from Defendants' violation of one or more of the above-described independent duties.

456. Defendants should have foreseen and anticipated that a violation of one or more of the above-described independent duties would constitute an appreciable risk to harm of others, including Terrance Osborne and her heirs.

457. If Defendants had not violated one or more of the above-described independent duties, then Terrance Osborne's death and damages, and the damages of her heirs, would not have occurred.

## COMPENSATORY DAMAGES SUSTAINED BY PLAINTIFFS

458. Plaintiff incorporates all previous allegations and statements as if fully restated herein.

459. The injuries and damages sustained by Terrance Osborne as a result of the Defendants' violations include but are not limited to the following:

    a. Terrance Osborne's physical pain and suffering;

    b. Terrance Osborne's mental pain and suffering;

    c. Terrance Osborne's age;

    d. Terrance Osborne's physical condition immediately before and after the incident;

    e. The nature and extent of Terrance Osborne's injuries;

    f. Loss of earnings; and,

    g. The reasonable expenses of the necessary medical care.

460. The Plaintiff's injuries and damages include all wrongful death damages pursuant to 12 O.S. § 1053, including but not limited to: (1) medical and burial expenses, (2) loss of consortium and grief, (3) mental pain and anguish of the

decedent, (4) conscious pain and suffering of the decedent, and (5) grief and loss of companionship to children and parents of the decedent.

461.     Plaintiff seeks all damages available under federal and state law for the claims alleged herein.

## AMOUNT OF DAMAGES

462.     The Plaintiff's injuries and damages are in excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently $75,000.00), plus attorney fees, interest, costs and all such other and further relief for which should be awarded as judgment against Defendants in an amount to fully and fairly compensate Plaintiffs for each and every element of damages that has been suffered.

## PUNITIVE DAMAGES

463.     Plaintiffs incorporate all previous allegations and statements as if fully restated herein.

464.     Plaintiff is entitled to punitive damages on claims brought against individual Defendants pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Terrance Osborne's federally protected rights.

465.     Plaintiff is entitled to punitive damages on claims brought against individual Defendants on state law claims where said individual Defendants were acting outside the scope of their employment, as Defendants' conduct, acts, and omissions alleged herein constitute reckless or callous indifference to Terrance Osborne's protected rights.

466.    Plaintiff is entitled to punitive damages on all other claims pursuant to 12 O.S. § 1053.

## DEMAND FOR JURY TRIAL

467.    Plaintiff demands a jury trial for all issues of fact presented by this action.

## RESERVATION OF ADDITIONAL CLAIMS

468.    Plaintiff reserves the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

WHEREFORE, Plaintiff prays for judgement against Defendants in a sum excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332 (currently $75,000.00) plus interests, costs, and all such other relief as to which Plaintiff may be entitled.

Respectfully Submitted,

Laird Hammons Laird, PLLC

**ATTORNEY LIEN CLAIMED**

Chris Hammons, OBA # 20233
Jason M. Hicks, OBA # 22176
Jonathan Ortwein, OBA # 32092
1332 S.W. 89th Street
Oklahoma City, OK 73159
Telephone: 405.703.4567
Facsimile: 405.703.4067
E-mail:    chris@lhllaw.com
           jason@lhllaw.com
           jonathan@lhllaw.com
*Attorneys for Plaintiff*