## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

KELLI GOODNIGHT, as Special )
Administrator for the Estate of TERRANCE )
LAVON OSBORNE, )
        )
          Plaintiff, )
        )
v. )      Case No. CIV-22-01053-JD
        )
TURN KEY HEALTH CLINICS, LLC, et al., )
        )
          Defendants. )

## <u>ORDER</u>

Before the Court are: (1) a Motion to Dismiss [Doc. No. 35] filed by Defendants

William Cooper, DO ("Dr. Cooper"), Derek McGuire, LPN ("McGuire"), Rebecca

Bruce, APRN ("Bruce"), David Sagin, LPN ("Sagin"), Christina Meza, RN ("Meza"),

Nicole Musgrove, CMA ("Musgrove"), Becky Pata, APRN ("Pata"), Alana Morris, LPN

("Morris"), Tara Wilson, LPN ("Wilson"), Sarah Nunez, LPN ("Nunez"), Sarah Chance,

LPN ("Chance"), and Brittany Linton, CMA ("Linton"); and (2) a Motion to Dismiss

[Doc. No. 36] filed by Defendant Turn Key Health Clinics, LLC ("Turn Key")

(collectively, the "Motions" and "Defendants"). The Motions seek to dismiss the First

Amended Complaint ("Complaint") [Doc. No. 25] filed by Plaintiff Kelli Goodnight, as

the Special Administrator of the Estate of Terrence Osborne ("Estate").[1] The Motions are

fully briefed and supplemented. *See* [Doc. Nos. 40, 41, 50, 79]. Upon consideration of the

---

[1] The Court substituted Goodnight for Shauntae Osborne-Franklin. *See* [Doc. Nos. 74–75].

operative pleading and briefing and the relevant law, the Court rules as follows.

## I.    <u>BACKGROUND</u>

Osborne suffered from chronic health conditions including congestive heart failure and bilateral peripheral edema. He also used a wheelchair. The medications he used to manage these conditions included methocarbamol, furosemide, lisinopril, potassium, omeprazole, and metoprolol. On October 21, 2020, Osborne was seen at the Norman Regional Hospital ("hospital") for his congestive heart failure and bilateral peripheral edema. Later that day after Osborne was released from the hospital, he was arrested by the Norman Police Department and taken to the Cleveland County Detention Center ("CCDC").

Turn Key is independently contracted to provide all medical services at CCDC. Dr. Cooper, Turn Key's medical director and only doctor, was the physician in charge of healthcare at CCDC and the entity's final health care policy maker. He oversaw intermediate-level providers, such as Bruce and Pata. Bruce, an advanced practice registered nurse for Turn Key, and Pata, a Turn Key nurse practitioner, conducted on-site medical evaluations and helped supervise lower-level providers. Dr. Cooper also oversaw lower-level providers, such as Wilson, Musgrove, Nunez, Chance, Morris, and Sagin. Lower-level providers were relied on to provide most of the care to detainees and expected to be the gatekeepers for higher-level providers, such as Dr. Cooper, Pata, and Bruce. At times, Turn Key delegated medical care tasks to staff for which they had not been trained. Additionally, the intermediate- and lower-level providers had little to no training on what conditions warranted additional care or when contacting a higher-level

provider was necessary. Dr. Cooper was ultimately responsible for Osborne's care at CCDC.

Sagin, a licensed practical nurse who worked for Turn Key, performed Osborne's medical intake screening. Sagin recorded that Osborne used a wheelchair, weighed 218 pounds, and had congestive heart failure. During this screening, Osborne complained of shortness of breath. On October 22, 2020, Morris, a licensed practical nurse employed by Turn Key, saw Osborne for his complaints of shortness of breath. Osborne told Morris that he had not yet received his medication since arriving at CCDC.

On October 23, 2020, Sagin checked on Osborne who had stated he believed he was having a heart attack. Osborne said he had experienced a sharp pain in his mid-sternal region while lying on his bunk. Sagin checked Osborne's vitals and offered him an antacid, which he declined. Sagin noted that Osborne needed a follow-up regarding his current medications since he had still not received them and explained that Osborne would be seen in the clinic during the upcoming week. That evening, a Turn Key employee noted in Osborne's file that his medications had been verified by Walgreens.

On October 24, 2020, Musgrove, a Turn Key certified medical assistant, administered medications to Osborne but did not accurately record the details of what she administered. Instead, her records only included a form that said Osborne refused some of his medications. On October 25, 2020, Nunez, a licensed practical nurse employed by Turn Key, attempted to administer Osborne's medications but reported that Osborne refused all his morning medications.

On October 26, 2020, Pata examined Osborne. Pata observed that Osborne was in

3

a wheelchair. Osborne told Pata that he had been unable to walk well since June. Pata took Osborne's vitals and weighed him. At the time, Osborne weighed 207 pounds. Pata also noted that he had edema and pitting in his extremities. She directed that Osborne was to discontinue using methocarbamol. She noted that Osborne's other medications were to be continued and that he would need lab work in six weeks and a follow-up ninety days later. That day, Nunez reported that Osborne refused to take his methocarbamol and omeprazole but did not refuse any other medications. That evening, Osborne was taken to the hospital for congestive heart failure, bilateral peripheral edema, and anasarca. Dr. Cooper, Wilson, Musgrove, Nunez, Chance, Morris, Sagin, Bruce, and Pata were aware Osborne was taken to the hospital.

On October 28, 2020, Sagin treated Osborne. He did not take Osborne's weight. Sagin observed that Osborne had tightness in his chest and gave him an antacid. Wilson, a licensed practical nurse, also aided Osborne, who was unable to get out of the shower, and checked his vital signs. She noted that Osborne urinated on himself and had requested the same twenty milligrams of furosemide that he had previously received at the hospital.

On October 29, 2020, Sagin visited Osborne because Osborne was complaining of facial swelling and requesting to go to the hospital. Sagin said Osborne refused his morning medications. Sagin did not weigh Osborne but observed that Osborne had swelling around his eyes and that Osborne's "current medications would be reviewed by medical." [Doc. No. 25 at 14].

On October 30, October 31, November 1, November 2, November 8, and

4

November 12, Nunez reported that Osborne refused all of his morning medications including methocarbamol which had been discontinued by Pata.

On November 1, 2020, Chance, a licensed practical nurse employed by Turn Key, visited Osborne. Osborne told Chance that he was experiencing shortness of breath along with intense burning, squeezing, and pressure in his heart. Osborne asked to go to the hospital. Chance's medical notes reflected that Osborne's prescription dosages and frequencies had been changed. On November 2, 2020, Morris saw Osborne for a nosebleed and took his vitals.

On November 3, 2020, Sagin checked on Osborne. Osborne was having difficulty breathing and his edema was still evident in his face and feet. His right foot was "weeping clear liquid." [Doc. No. 25 at 15]. Sagin contacted a higher-level provider and was instructed to give Osborne a one-time extra dose of 20 milligrams of furosemide. Nothing else was done to treat his right foot.

On November 4, 2020, Bruce and Sagin visited Osborne. Both Bruce and Sagin recorded that Osborne refused care because he would not get up from his bunk. However, they knew Osborne used a wheelchair and that losing mobility was a common side effect of congestive heart failure. Bruce issued an order to the other healthcare providers that Osborne's weight should be taken daily and that an increase of five pounds or more should be reported to a higher-level provider. Bruce followed Osborne's treatment and was made aware of his worsening condition by lower-level providers.

On November 11, 2020, Musgrove visited Osborne and noted that he was "non compliant" and refused all of his morning medications. [Doc. No. 25 at 18]. When a

different nurse checked in on Osborne that day and called Pata because Osborne's condition had worsened, Pata authorized an extra dose of furosemide. Pata made no other treatment recommendations. Wilson noted that Osborne refused his medications that evening. Wilson also reported that Osborne was upset and claimed he was having trouble breathing. He told Wilson that, contrary to what the other healthcare providers said, he had not refused his medications. Instead, he told Wilson that he was unable to walk to the medication cart to receive his medications.

On November 12, 2020, Musgrove reported that Osborne refused both his morning and evening medications because he could not "get up." [Doc. No. 25 at 19]. Wilson also saw Osborne because he was laying on his bed claiming that he could not move and was asking for help. Wilson reported that Osborne's face, neck, and eyes were swollen, and that Osborne was requesting to go to the hospital. At this time, Osborne took his evening medication and was provided with a new urinal since he was urinating frequently and unable to get to a toilet. He again told Wilson that he had not been refusing his medications.

On November 13, 2020, Morris visited Osborne. Osborne was lying in his cell covered in urine and refused to shower or change. He repeatedly requested to be taken to the hospital. Morris falsely recorded that he refused to take his medication that day. In reality, Osborne took his morning dose of furosemide but was not given his evening dose. In her report, Morris also falsely claimed that Osborne refused wound care to his legs. Wilson also visited Osborne and noted his swelling had mildly decreased.

On November 14, 2020, Chance went to Osborne's cell to provide wound care for

6

his legs. Osborne asked for a shower, and Chance recorded that he refused wound care. Chance helped Osborne to the shower and provided him with clean clothes along with his wheelchair. That evening, Wilson was called to Osborne's cell because it appeared he was not breathing. When he was found unresponsive, Osborne was taken to the hospital, where he died.[2]

Throughout Osborne's time at CCDC, Dr. Cooper reviewed Osborne's medical records and supervised Osborne's care. As a result, he knew of Osborne's worsening condition which included severe edema; swelling of his face, eyes, neck, and legs; and Osborne's inability to move or see. He was also aware that Osborne was not being weighed daily. Dr. Cooper never personally examined or visited Osborne.

The Estate filed suit in the District Court of Cleveland County Oklahoma. It brought claims for constitutional violations and negligence. Defendants jointly removed the case to this Court. Several parties have since been dismissed or in default. *See* [Doc. Nos. 24, 37, 73, 76, 78].

## II.    LEGAL STANDARD

"Rule 12(b)(6) dismissal 'is appropriate if the complaint alone is legally insufficient to state a claim.'" *Serna v. Denver Police Dep't*, 58 F.4th 1167, 1169 (10th Cir. 2023) (quoting *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104–05 (10th Cir. 2017)). The Court must "view the allegations and all reasonable

---

[2] *See* [Doc. No. 25 at 25]. The Complaint alleges Osborne died on November 14, 2020, *see, e.g.*, [Doc. No. 25 at 29–30 ¶ 125; *id.* at 37 ¶ 155], but elsewhere the Estate states Osborne died on November 15, 2020, *see* [Doc. No. 40 at 6; Doc. No. 41 at 7].

inferences in favor of the plaintiffs." *Hubbard v. Okla. ex rel. Okla. Dep't of Hum. Servs.*, 759 F. App'x 693, 696 (10th Cir. 2018) (unpublished).

In considering a motion to dismiss under Rule 12(b)(6), the inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Doe v. Woodard*, 912 F.3d 1278, 1299 (10th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678, 679.

## III.  <u>ANALYSIS</u>

Defendants argue that the Estate's claims should be dismissed because it has not plausibly alleged that Osborne's Eighth Amendment rights were violated. Turn Key also contends that the Estate has failed to plausibly allege the elements necessary for municipal liability. Lastly, Defendants argue that the Estate has failed to state negligence claims against them.

At the outset, the Court notes that in one of its responses, the Estate says it is "abandoning" its claims "against Meza, Linton, and McGuire." [Doc. No. 40 at 6]. Therefore, the Court concludes that all claims against these individuals have been

abandoned. *See United States v. Egli*, 13 F.4th 1139, 1144 (10th Cir. 2021) ("Waiver

comes in two flavors—invited error and abandonment . . . [Abandonment] 'occurs when

a party deliberately considers an issue and makes an intentional decision to forgo it.'"

(quoting *United States v. Malone*, 937 F.3d 1325, 1327 (10th Cir. 2019))).

> **A.  The Court dismisses the Estate's Eighth Amendment claims against Musgrove, Morris, Wilson, Nunez, and Chance, but denies the Motions as to these claims against Dr. Cooper, Bruce, Pata, Sagin, and Turn Key.**

Defendants argue the Estate has failed to plausibly allege that Osborne was at

substantial risk of serious harm while incarcerated at CCDC, and that they consciously

disregarded any such risk. The Estate maintains that Defendants failed to properly treat

Osborne or refer him to an outside provider, which shows they were deliberately

indifferent to his medical needs.

"[D]eliberate indifference to serious medical needs of prisoners constitutes" an

Eighth Amendment violation. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To establish

an Eighth Amendment claim based on inadequate medical care, the prisoner must prove

both an objective component and a subjective component." *Redmond v. Crowther*, 882

F.3d 927, 939 (10th Cir. 2018). "Under the objective inquiry, the alleged deprivation

must be 'sufficiently serious' to constitute a deprivation of constitutional dimension. In

addition, under the subjective inquiry, the prison official must have a 'sufficiently

culpable state of mind.'" *Self v. Crum*, 439 F.3d 1227, 1230–31 (10th Cir. 2006)

(citations omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Here,

Defendants' arguments focus on the subjective inquiry. Regardless, the Court is satisfied

that the Estate has plausibly alleged that Osborne's medical need was sufficiently serious. *See Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023) ("'[M]edical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (alteration in original) (quotations omitted) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000))).

For the subjective component, officials must know of and disregard "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "In addition, [defendants] who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A [defendant's] duty under the Eighth Amendment is to ensure 'reasonable safety'. . . ." *Id.* at 844 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). More specifically, "the subjective component can be satisfied under two theories: failure to properly treat a serious medical condition ('failure to properly treat theory') or as a gatekeeper who prevents an inmate from receiving treatment or denies access to someone capable of evaluating the inmate's need for treatment ('gatekeeper theory')." *Lucas*, 58 F.4th at 1137.

For the failure to properly treat theory, courts consider whether "[t]he patient's medical issue obviously required 'additional medical care and referral.'" *Id.* at 1138

(quoting *Self*, 439 F.3d at 1232). For example, if "a medical professional fails to treat a medical condition so obvious that even a layman would recognize the condition, *e.g.*, a gangrenous hand or a serious laceration," the subjective component of the failure to properly treat theory would be met. *Self*, 439 F.3d at 1232. However, "'a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation . . . .'" *Id.* at 1231 (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 (10th Cir. 2001)).

For the gatekeeper theory, courts consider whether the medical professional has "fulfilled their sole obligation to refer or otherwise afford access to medical personnel capable of evaluating a patient's treatment needs when such an obligation arises." *Lucas*, 58 F.4th at 1139. "'[A] good faith effort to diagnose and treat [the inmate's] medical condition'" will satisfy this obligation; "'completely refus[ing] to assess or diagnose' the potential . . . emergency" will not. *Self*, 439 F.3d at 1232 (second brackets in *Self* and first and third brackets and ellipses added) (quoting *Mata v. Saiz*, 427 F.3d 745, 761, 758 (10th Cir. 2005)).

Initially, the Court addresses the multitude of boilerplate arguments in the Complaint. For example, in eight different places, the Estate asserts identical allegations against different Defendants saying they were aware of:

> a. [Osborne's] diagnosed congestive heart failure; b. [Osborne's] limited mobility and need for a wheelchair; c. [Osborne's] repeated complaints of chest pains, shortness of breath, and an inability to move or get out of bed at times; d. [Osborne's] severe and worsening edema, anasarca, and ascites; e. [Osborne's] face swelling to the point he could not see; f. [Osborne's] skin sloughing off of his feet; g. [Osborne's] legs and feet weeping fluids; h. [Osborne's] feet were emitting foul odors; i. [Osborne's] legs and feet

11

had clear signs of infection; j. The necessity of a congestive heart failure patient's medications to be provided as prescribed; k. The necessity of monitoring the weight of a congestive heart failure patient to monitor for worsening of their condition; l. The order put in by Defendant Bruce on November 4, 2020, that [Osborne's] weight be monitored daily . . . .

[Doc. No. 25 at 41, 43–44, 45–46, 47–48, 49–50, 51–52, 53–54, 55–56]. The Estate again

repeats itself in the Complaint, near verbatim, seven times stating:

Despite his awareness of this information, [defendant] failed to administer [Osborne] his medications on multiple occasions due to [Osborne's] complaints that he could not get out of bed. Rather than take the extra steps to administer [Osborne's] medications, [defendant] falsely noted that [Osborne] was refusing his medications. Despite his awareness of the information set out above, [defendant] never referred [Osborne] for evaluation by a higher level provider or requested that he be sent for outside, specialty or emergency medical care as his condition obviously deteriorated. Despite his awareness of the serious medical conditions and [Osborne's] deteriorating condition, as well as his awareness of the order to monitor [Osborne's] weight for worsening of his condition, [defendant] never checked [Osborne's] weight from the time of that order through his death on November 14, 2020.

[Doc. No. 25 at 44; *see also id.* at 41–42, 46, 48, 50, 52, 56]. The only differences among

these portions of the Complaint are minor, such as inserting the different Defendants'

names and correct pronouns. These kinds of conclusory, copy and paste allegations are

unacceptable under the *Twombly/Iqbal* standard. "The *Twombly* Court was particularly

critical of complaints that 'mentioned no specific time, place, or person involved in the

alleged conspiracies.' Given such a complaint, 'a defendant seeking to respond to

plaintiffs' conclusory allegations . . . would have little idea where to begin.'" *Robbins v.

Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citations omitted) (quoting *Bell Atl.

Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007)). Plus, "'[a]t some point the factual

detail in a complaint may be so sketchy that the complaint does not provide the type of

notice of the claim to which the defendant is entitled under Rule 8.'" *Id.* (quoting *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007)). Therefore, the Court discards the cookie-cutter allegations made against the Defendants and, in its analysis below, only relies on the Complaint's plausible allegations.

        1.      <u>The Estate has plausibly alleged Eighth Amendment claims against Dr. Cooper, Bruce, Pata, and Sagin.</u>

Dr. Cooper was ultimately responsible for Osborne's medical care and aware of Osborne's condition which obviously needed some type of treatment—particularly considering that Dr. Cooper knew it was deteriorating. Yet, Dr. Cooper took no action. He did not visit, treat, or transfer Osborne. Even "[a] deliberately indifferent delay in treatment that causes a detainee to experience several hours of severe, untreated pain . . . may be a constitutional violation." *Buchanan v. Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *6 (10th Cir. Oct. 24, 2023) (unpublished). And here, there was not just a delay. Dr. Cooper provided no referral or treatment at all.

Bruce was responsible for on-site treatment and assessment of the detainees at CCDC including Osborne. She knew of Osborne's worsening condition but only checked on him once. When Osborne could not retrieve his medications from the medicine cart, she said he had "refused" them. Lower-level providers also informed her of what was going on with Osborne. Despite knowing of Osborne's increasing edema and debilitating condition in his legs and feet, Bruce did not take steps to address Osborne's medical issues which "obviously required 'additional medical care and referral.'" *Lucas v. Turn*

*Key Health Clinics, LLC*, 58 F.4th 1127, 1138 (10th Cir. 2023) (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)).

Pata was responsible for conducting on-site medical evaluations. She knew of Osborne's visit to the hospital but only evaluated Osborne once. As an intermediate-level provider, Pata was made aware by lower-level providers of Osborne's continually worsening edema which affected his legs, eyes, face, and neck. Although at one point Pata authorized an extra dose of furosemide, she knew before and after that Osborne's legs were weeping fluid, giving off foul odors, and displaying clear signs of infection. Yet, she did not provide additional medical care or referral to a higher-level provider or the hospital. By failing to address these issues despite their obvious need for some type of treatment, Pata "did not commit mere malpractice but rather consciously disregarded substantial risk to the inmate." *See id.*

Sagin was similarly involved in caring for Osborne. Having visited him several times, Sagin was aware of Osborne's condition but did not provide care for him on November 4 just because he could not get off his bunk. Sagin even knew Osborne's congestive heart failure severely limited his mobility. Additionally, Sagin failed to administer Osborne's medications and falsely noted that Osborne refused his medications. In so doing, Sagin failed to treat Osborne who obviously needed additional care.

These individuals did not just render a course of treatment that was inadequate, they failed to exercise medical judgment. *Cf. id.* at 1137 ("A claim that a course of treatment was inadequate after the exercise of medical judgment, absent an extraordinary

degree of neglect, also does not rise to disregard of serious medical need."). Dr. Cooper, Bruce, Pata, and Sagin either failed to treat a medical condition so obvious that even a layman would recognize it or did not provide access to medical personnel capable of evaluating Osborne's treatment needs when they arose. Of course, at times Bruce, Pata, and Sagin provided treatment. The Court does not base its decisions on these instances. Instead, the Court premises its reasoning on the times when these Defendants were aware of Osborne's worsening condition (that obviously needed treated) and yet did nothing. Therefore, at this stage, the subjective component of the deliberate indifference test is met, and the Estate has plausibly alleged Eighth Amendment claims against Dr. Cooper, Bruce, Pata, and Sagin.[3]

> 2.    <u>The Estate has failed to plausibly allege Eighth Amendment claims against Musgrove, Morris, Wilson, Nunez, and Chance.</u>

The allegations made specifically against Musgrove are that she administered medications to Osborne but did not accurately keep a record of them, failed to weigh Osborne, and on two different days did not give Osborne his medication because he was

---

[3] The Estate argues that even if Dr. Cooper, Bruce, and Pata did not personally violate Osborne's constitutional rights, they did so via supervisor liability. In such situations, "the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010). This standard is met by showing "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Dodds*, 614 F.3d at 1199). However, because the Court is satisfied the Estate has plausibly alleged that these Defendants personally violated Osborne's Eighth Amendment rights, it does not reach these arguments.

noncompliant and could not get up. But there are no allegations, specific to Musgrove, that say she knew Osborne's condition limited his mobility or that she was supposed to weigh him when she attempted to administer his medication. As alleged, it is not clear that Musgrove knew of a substantial risk to Osborne's health or safety and then disregarded that risk.

When Morris saw Osborne, she took his vitals and treated him for a nosebleed. The allegation that, on one day, Morris falsely noted that Osborne refused his medicine and treatment for his legs, is not enough on which to premise an inadequate medical care claim. The Court was not provided details about these false statements. For example, the Complaint does not explain whether Osborne actually received his medication or asked for his medication but did not receive it. It is also unclear if Morris even intended to falsify her records or whether it was just an accident. In sum, the allegations do not plausibly state an Eighth Amendment claim as to Morris.

When Wilson visited Osborne, she took his vitals and provided him with a urinal. She also reported on Osborne's condition and request to go to the hospital. This is not enough to plausibly allege that Wilson failed to properly treat Osborne or give him access to someone capable of evaluating his needs for treatment.

Nunez reported that Osborne refused his medications over the course of several days. Not much else is alleged against her, and the Estate did not provide many details regarding these refusals except that one of the medications she was attempting to administer had been discontinued by Pata. This alone does not meet the subjective component of the deliberate indifference test.

16

Chance visited Osborne, provided care for his legs, and helped him shower. The Estate alleges that Chance's medical notes reflect changed prescription dosages and frequencies for Osborne's furosemide, but it is unclear what the significance of this is as related to Chance. In fact, it is unclear what Chance did that the Estate believes shows knowledge of and disregard for a substantial risk to Osborne's health or safety.

The Court notes that none of these individuals weighed Osborne. However, weighing someone is not the same as treating an obvious medical issue. So even if these Defendants had a duty to weigh Osborne, such allegations go to whether they were negligent, not whether they failed to provide adequate medical care. In fact, most of the Estate's complaints against Musgrove, Morris, Wilson, Nunez, and Chance, such as their failure to give Osborne the right medicine or care or accurately record what medication they administered, more naturally go to whether they were negligent—not whether they were deliberately indifferent. For example, the Complaint does not make clear that they had a sufficiently culpable state of mind. At best, it is speculative as to whether Musgrove, Morris, Wilson, Nunez, and Chance actually knew of a substantial risk to Osborne's health and failed to fulfill their duties under the failure to properly treat and gatekeeper theories. When the collective conclusory statements against these Defendants are discarded, there is simply not enough to plausibly allege that Musgrove, Morris, Wilson, Nunez, and Chance violated Osborne's Eighth Amendment rights.

3.    The Estate has plausibly alleged an Eighth Amendment claim against Turn Key.

"[A] municipality can be found liable under § 1983 only where the municipality

itself causes the constitutional violation at issue. Respondeat superior or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis omitted) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "[A] plaintiff seeking to impose liability on a municipality under § 1983" must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."[4] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

An entity is not liable under § 1983 "unless deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Id.* at 400 (emphasis omitted). "For individual defendants, the applicable state of mind will depend on the type of constitutional violation at issue. In contrast, the prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 771 n.5 (10th Cir. 2013) (citations omitted). Thus,

---

[4] "[T]o establish municipal liability, a plaintiff must first demonstrate a 'municipal policy or custom,' which may take one of the following forms: '(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.'" *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)). The Estate alleges facts that go to several of these bases. At this stage, the Court is satisfied the Estate has plausibly alleged that Turn Key has failed to adequately train its employees. Thus, the Court does not analyze the Estate's other bases for an official policy or custom.

"to hold a municipality liable, a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring." *George ex rel. Bradshaw v. Beaver Cnty. ex rel. Beaver Cnty. Bd. of Comm'rs*, 32 F.4th 1246, 1253 (10th Cir. 2022).

First, lower-level providers, such as Wilson, Nunez, Chance, Morris, and Sagin, were relied on to provide most of the care to detainees like Osborne and expected to be the gatekeepers for higher-level providers, such as Dr. Cooper, Pata, and Bruce. However, they had little to no training on what specific conditions and symptoms warranted contacting a higher-level provider. Further, Turn Key did not provide any resources or actual training to its licensed practical nurses on adequate medical care. It also improperly delegated medical care tasks to staff that was beyond the scope of the training they had received.

Second, the Estate alleges that as a result, Osborne's Eighth Amendment rights were violated. And for the reasons previously stated, the Court determines that the Estate has alleged plausible constitutional violations against several of the individual Defendants.

Third, "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Here, the Estate alleges that Turn Key was put on notice that its

failure to train its employees was substantially certain to result in a constitutional violation and then disregarded that risk. For example, the Estate provides allegations regarding numerous other instances in which CCDC or Turn Key detainees died or were permanently injured from their lack of adequate medical care. [Doc. No. 25 at 76–81]. The Estate alleges these instances show that Turn Key's employees were undertrained and "ill-equipped to evaluate, assess, supervise, monitor, or treat inmates, like [Osborne]." [*Id.* at 90–91]. The Court agrees that these allegations support a showing that Turn Key was deliberately indifferent by failing to adequately train its employees.

At this stage in the proceedings, the Estate has plausibly alleged that Turn Key's policy of failing to adequately train its employees caused Osborne's Eighth Amendment violation and that Turn Key maintained this policy with deliberate indifference to the risk of Osborne's constitutional injury occurring.

### B. The Court declines to dismiss the Estate's negligence claims against Defendants.

The parties dispute whether Defendants are entitled to immunity under the Oklahoma Governmental Tort Claims Act ("OGTCA"). Okla. Stat. tit. 51, § 151, *et seq*. Defendants argue that the Oklahoma Supreme Court's opinion in *Barrios* "squarely addressed" this issue, and that they are entitled to immunity as a result. *See Barrios v. Haskell Cnty. Pub. Facilities Auth.*, 432 P.3d 233, 241 (Okla. 2018). The Estate argues that Defendants are not entitled to immunity because they are not covered under the OGTCA's definition of "employee."[5]

---

[5] The Estate filed a supplement directing the Court's attention to *Sanders v. Turn*

"An employee of the state or its political subdivision who operates or maintains a jail or correctional facility is exempt from state tort liability under the OGTCA." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1147 (10th Cir. 2023) (citing Okla. Stat. tit. 51, § 155(25)). The term "employee" includes "licensed medical professionals under contract with city, county, or state entities who provide medical care to inmates or detainees in the custody or control of law enforcement agencies." Okla. Stat. tit. 51, § 152(7)(b)(7).

"In a footnote in *Barrios v. Haskell County Public Facilities Authority*, 432 P.3d 233, 236 n.5 (Okla. 2018), the Oklahoma Supreme Court stated, 'Generally speaking, the staff of a healthcare contractor at a jail are "employees" who are entitled to tort immunity under the [O]GTCA.'" *Bond v. Regalado*, No. 22-5065, 2023 WL 7014047, at *3 (10th Cir. Oct. 25, 2023) (unpublished). However, district courts have been instructed that, on a motion to dismiss, it is "premature" to determine whether healthcare contractors and prison doctors, nurses, etc. "[are] entitled to immunity based on *Barrios*'s non-binding legal assumption, which was decidedly not an express statement of law." *Lucas*, 58 F.4th at 1148. Instead, "the proper route" for district courts to take "is to determine the OGTCA's applicability to private corporations — and their employees — that contract with the state to provide medical services at the summary judgment stage if the factual

---

*Key Health Clinics*, Case No. SD-121589, an Oklahoma Court of Civil Appeals opinion. The court's unpublished opinion held that Turn Key was not an employee under Okla. Stat. tit. 51, § 152(7), and therefore not immune from liability under the OGTCA. Regardless, as stated below, the Court does not dismiss the Estate's negligence claim against Turn Key.

record is sufficiently developed and the facts are uncontroverted." *Id.*

Thus, the Court determines that the Estate's allegations do not conclusively establish that Defendants are entitled to immunity under the OGTCA. Based on the Tenth Circuit's instruction in *Lucas*, the Court declines to dismiss the negligence claims against Defendants on this ground at the pleading stage.[6]

## IV. <u>CONCLUSION</u>

For these reasons, the Court dismisses all claims against Meza, Linton, and McGuire without prejudice. The Court dismisses the Eighth Amendment claims against Musgrove, Morris, Wilson, Nunez, and Chance without prejudice.[7] The Court denies Defendants' Motions as to the Eighth Amendment claims against Dr. Cooper, Bruce, Pata, Sagin, and Turn Key. The Court denies Defendants' Motions as to the negligence claims against Dr. Cooper, Bruce, Pata, Sagin, Musgrove, Morris, Wilson, Nunez, Chance, and Turn Key. In light of the Court's Order, the Estate's Motion to Conduct

---

[6] Dr. Cooper briefly argues that the Estate has failed to state a negligence claim against him because it has not alleged the required elements of breach, causation, and injury. The Court disagrees. The Estate has alleged that Dr. Cooper was the physician responsible for Osborne's care and that he failed to fulfill this duty, which then caused Osborne's death. At this stage, this is sufficient to state a claim for negligence against Dr. Cooper.

[7] In its response, the Estate seeks leave to amend and cure any deficiencies in its first amended complaint regarding these individual Defendants. *See* [Doc. No. 40 at 30]. But "[a] response to a motion may not also include a motion or a cross-motion made by the responding party." LCvR7.1(c). Should the Estate seek leave to file a second amended complaint as to its Eighth Amendment claims as to these individual Defendants, it must comply with Federal Rules of Civil Procedure 7 and 15 and Local Civil Rules 7.1 and 15.1, and any deadlines in the forthcoming scheduling order (and if beyond the deadlines in the scheduling order, the Estate must also comply with Federal Rule of Civil Procedure 16).

Discovery [Doc. No. 80] while the Motions to Dismiss are pending is denied as moot.

IT IS SO ORDERED this 12th day of September 2024.

_____

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE